FIRST OF AMERICA BANK–CENTRAL, formerly American Bank & Trust Company, Personal Representative of the Estates of William F. Cole and Wanda J. Cole, Deceased, Plaintiff,

v.

UNITED STATES of America, and Delta Air Lines, Inc., a Delaware Corporation, Jointly and Severally, Defendants.

No. G83–949.

United States District Court, W.D. Michigan, S.D.

June 24, 1986.

James F. Graves, Willingham, Coté, Hanslovsky, Griffith & Foresman, East Lansing, Mich., for plaintiff.

C. Barry Wetherington, Plunkett, Cooney, Rutt, Watters, Stanczyk & Pedersen, Detroit, Mich., for Delta Air Lines.

J. Paul McGranth, Asst. Atty. Gen., John A. Smietanka, U.S. Atty., Edith Landman, Asst. U.S. Atty., Richard R. Stone, Sr., U.S. Dept. of Justice, Washington, D.C., for U.S. of America.

OPINION

HILLMAN, Chief Judge.

This litigation stems from a September 19, 1981 crash of a single engine aircraft at Dallas/Fort Worth Regional Airport ("DFW"), which killed the pilot, William F. Cole, and his wife and passenger, Wanda J. Cole. The crash allegedly occurred when the aircraft encountered turbulent air, also known as wake turbulence or wingtip vortices, generated by a Delta Airlines 727 jet making a final approach to runway 17R at DFW. Plaintiff First of America Bank-Central, Personal Representative of the Estates of William and Wanda Cole, contends that the acts and/or omissions of the Delta crew and air traffic controllers at DFW were responsible for the encounter and resulting crash. Plaintiff seeks damages for the alleged wrongful deaths of Mr. and Mrs. Cole, suing defendant United States under the Federal Tort Claims Act, 28 U.S.C. § 1346(b), and asserting a diversity of citizenship negligence claim against defendant Delta Air Lines, Inc.

Plaintiff's claim against Delta was tried to a jury and the claim against the United States was concurrently tried to the court from September 17, 1985 to October 8, 1985. Approximately 96 exhibits were marked and entered during the trial. Deposition testimony of 11 witnesses was read into the record, and 18 witnesses testified in person, including the following experts: for plaintiff, Jack J. Eggspuehler, a pilot expert, Dr. Gerald Gregorek, a wake turbulence expert, and Frank M. McDermott, a tower control expert; for defendant Delta, pilot expert Paul Soderlind; for defendant United States, wake turbulence and pilot expert Joseph Tymczyszym, and controller expert Ray Yeager. On October 8, 1985, the jury returned a verdict of no cause for action on the claim against Delta. The court took the claim against the United States under advisement. This opinion constitutes the court's findings of fact and conclusions of law on that claim as required by Fed.R.Civ.P. 52(a).

On September 19, 1981, William Cole ("Cole") was 40, his wife was 43, and they

had two children, a fourteen year old daughter, Penny Lynn, and a twenty-two year old son, William Scott.

Cole received his private pilot certificate with a single engine land rating in December 1980. He had no instrument rating. As of September 19, 1981, Cole had approximately 129 hours total flight experience, only 7.3 of them at night (and all but .3 hours of those night hours had been with an instructor). Only once before had he flown into a large metropolitan area, and then only to an airport, Chicago Meigs Field, where no airliners land, and he was accompanied by an instructor on that flight. It was questionable whether he was legally qualified to fly at night, since his flight records did not document three completed night landings to a full stop within the last ninety days before the flight to Texas, as required by aviation regulations. Notwithstanding his relative inexperience, he had been instructed about terminal control areas ("TCAs"),[1] the operational and equipment requirements for entering them, and he had been shown how TCAs were depicted on aviation charts.

On September 19, 1981, Cole rented a single engine Piper Arrow, Model PA 28RT-201, Registration Mark N2156H, from Miller Aviation of Eagle, Michigan. Cole took off from Grand Ledge, Michigan, early on the morning of September 19, 1981, with his wife as a passenger. His ultimate destination was San Antonio, Texas, where they were to attend a convention. He did not file a flight plan upon leaving Grand Ledge.

Cole flew nonstop from Grand Ledge to Cape Girardeau, Missouri, where he landed after contacting the Cape Girardeau Flight Service Station ("FSS") by radio at 2:02

p.m., Central Daylight Time ("C.D.T."). (All times noted hereafter are C.D.T.). The airplane was refueled with 37 gallons of aviation fuel. Cole departed Cape Girardeau Airport at approximately 3:25 p.m., radioing the Cape Girardeau FSS to notify them of his departure. He did not file a flight plan upon leaving Cape Girardeau.

At approximately 5:53 p.m., Cole radioed the Little Rock, Arkansas FSS requesting and receiving the winds aloft at 6,000 feet. At approximately 7:27 p.m., Cole radioed the Dallas, Texas FSS requesting and receiving the Rockwall, Texas Airport UNICOM[2] frequency. FSS also advised Cole of the then current Dallas-Love Field altimeter setting.

At approximately 7:50 p.m., Cole was observed landing at the Rockwall, Texas airport by Gale and Carol Jones, who were working on their own airplane parked at that airport. Cole taxied to the gas pumps and turned off his engine. The Coles deplaned and spoke with the Jones about refueling. The Jones told them that the Rockwall gas pumps were closed for the evening. They advised Cole that the closest refueling point was probably Addison Airport. They offered Cole some gas from their own airplane and also offered to take the Coles to a nearby motel until the Rockwall pumps opened the next morning. The Coles declined both offers. The Jones then gave them instructions to Addison Airport. Cole was warned to be especially careful because Addison was difficult to locate at night and if he overshot Addison, he would be entering the DFW TCA, which they specifically warned him to avoid. They advised Cole to try Dallas-Love Field if Addison was closed. Addison Airport is approximately 20 nautical miles northwest of

1. A TCA, or terminal control area, is designated controlled airspace extending from the surface or higher to specified altitudes within which all planes are subject to air traffic control and to operating rules and pilot and equipment requirements specified in federal aviation regulations. "Group I" TCAs have the strictest operational requirements because they involve the busiest locations in terms of aircraft operations and passengers carried. DFW is a Group I TCA. [Plaintiff's Exhibit 20-A, Airman's Information

Manual ("AIM"), current as of September 19, 1981, Chapter 3, § 3, Part 96, p. 37].

2. UNICOM is a non-government communication facility which provides airport information at certain airports to pilots radioing the appropriate UNICOM facility radio frequency. [Plaintiff's Exhibit 63, Air Traffic Control Manual ("ATCM"), current as of 9/19/81, Appendix 4, Pilot/Controller Glossary, p. 42].

Rockwall and 11 nautical miles northeast of DFW. Dallas-Love Field is approximately 7½ nautical miles south of Addison and 11 to 12 nautical miles southeast of DFW. At approximately 8:00 p.m., Cole took off from Rockwall to the south, turned east and then turned north toward Addison Airport.

Between 8:00 and 8:15 p.m., Robert Levinson, seated in his parked car beside a roadway paralleling the runway at Addison Airport, saw a plane approaching from the north, descending for a landing. It touched the runway for approximately 5 seconds, suddenly took off again, retracting its wheels and making a right turn in the air to the west. It continued in a westerly direction toward DFW for as long as he continued to watch it. His description of the plane fit the type of aircraft Cole was flying. The Addison Airport tower was closed at the time.

The surface weather conditions at DFW between 8:00 and 8:30 p.m. on September 19, 1981, were clear skies, visibility of 15 miles, winds from 170 degrees at 6 knots. Cole was flying his aircraft under visual flight rules ("VFR"),[3] and VFR conditions prevailed at DFW. VFR aircraft arriving at the DFW TCA must contact DFW approach control at a designated radio frequency, state their position, direction of flight and destination, and obtain clearance to enter the TCA.[4] Additionally, whatever the weather conditions, all pilots prior to operating within the TCA must have an operating code transponder[5] and a two-way radio capable of communicating with air traffic controllers on appropriate frequencies. Cole entered the DFW TCA on September 19, 1981, without obtaining clearance, without radio communications, and without operating his transponder.

Richard E. Wiggins, an FAA employee, was working as an air traffic controller in DFW's windowless radar room located on the first floor of the DFW tower on the evening of September 19, 1981. He was performing approach control functions at the combined AR1–AR2 position. Runways 17R and 17L at DFW are parallel runways running north and south, with runway 17R being located to the west of runway 17L. Traffic that night was landing from north to south on runway 17R, so the airspace worked by Wiggins' radar position extended approximately 20 miles north of DFW and 5 to 6 miles east of runway 17L's centerline, from the surface up to 5,000 feet. However, since radar is based on line-of-sight, it picks up primary targets[6] within the controlled airspace up to 17,500 feet and down to the surface, assuming no buildings or other obstructions vary the radar's line of sight.

Once feeder positions in the radar room established radio contact with a plane inbound to DFW, the plane was "handed off" to Wiggins, who generally already had radar contact with the plane on his radarscope. Wiggins was then responsible for assigning the plane a sequence number in the final approach traffic pattern for run-

---

3. Visual flight rules govern procedures for flying under visual (as opposed to instrument) conditions, and the term "VFR" is also used to indicate weather conditions equal to or greater than minimum VFR requirements. [ATCM, Appendix 4, Pilot/Controller Glossary, p. 42].

4. VFR Terminal Area Chart for DFW TCA, July 9, 1981, Edition, VFR Flight Procedures. [Defendant Delta's Exhibit A–1].

5. A transponder is a radar beacon receiver/transmitter box located within the aircraft which, when set to the appropriate code, automatically interrogates ground radar stations and returns a signal to them which provides information such as airspeed, position, altitude and aircraft identification to the radar operator

through his radar scope. [ATCM, Appendix 4, Pilot/Controller Glossary, p. 41].

6. "Primary" (a/k/a "skin paint" or "raw") radar relies on a signal transmitted from a radar antenna site. This signal reflects off of or "bounces back" from an object such as an aircraft, and the reflected signal appears as a "target" or bleep on the controller's radar scope. When an aircraft is equipped with an operating code transponder, both the primary returns and the transponder signal information on airspeed, position, altitude, etc., are jointly displayed on the radar scope, giving the air traffic controller what is known as a "secondary" (a/k/a "enhanced" or "reinforced") radar which permits far more rapid target identification. [AIM, Chapter 1, § 2, Part 31, p. 16].

way 17R. Once an inbound plane under VFR conditions received a sequence number and its pilot advised Wiggins that he had sight of the runway (if he was not following any traffic) or of the immediate traffic he was following on the approach, Wiggins advised the pilot to contact local control in the tower cab, gave the pilot the local control frequency, and "handed off" the plane to local control for final clearance and landing. On the evening of September 19, 1981, John C. White, an FAA employee, was the air traffic controller working the Local Control West ("LCW") position in the DFW tower cab, controlling landings and takeoffs on runway 17R from the west side of the cab. David P. Medina was the FAA controller working the Local Control East ("LCE") position, controlling landings and takeoffs on runway 17L from the east side of the tower cab. The DFW tower is located directly between runways 17R and 17L.

Delta Flight 711 ("D711"), a stretch Boeing 727/200, originated in Houston on the evening of September 19, 1981, at approximately 7:00 p.m., crewed by Captain Richard L. Dillman, First Officer Allen A. Pankey, and Second Officer Michael Sutton, all Delta employees, on an IFR[7] flight plan to DFW. At 8:11:05 p.m., D711 radioed Wiggins that it was descending to 5,000 feet. Wiggins acknowledged that call. At 8:11:17, D711 requested its sequence number. At 8:11:20, Wiggins assigned D711 sequence number 3, behind an American 727, which was seven miles out on a final approach. At 8:11:34, Wiggins assigned Delta Flight 321 ("D321") sequence number 4 behind D711. At 8:11:40, Wiggins turned D711 onto its base leg[8] for a 17R landing. At 8:12:33, Wiggins cleared D711 for a visual approach to runway 17R behind the American 727 and turned D711 over to White/LCW in the tower cab.

D711 acknowledged that turnover at 8:12:49 and changed to the tower cab frequency being worked by White/LCW. In similar fashion, Wiggins thereafter turned D321 onto a base leg behind D711, cleared D321 for visual approach behind D711, and eventually handed D321 off to White/LCW at 8:14:07.

Wiggins first saw the Cole primary target on his radarscope shortly before 8:14:59, when it was approximately 5 miles northeast of DFW in a left turn to a westerly heading. A few radar sweeps later, the target's direction was established as southwest bound and its position was 4 miles north of DFW. Wiggins called White/LCW at 8:14:59 and asked if White saw the "traffic out there about four north that's southwest bound—primary." Because Cole did not have his transponder operating, Wiggins' radar observations of the primary target told him nothing more than the target's general heading, location and that it was moving at a slow speed. He had no way of ascertaining whether the target was a small, large or heavy aircraft, nor could he determine its specific altitude, general altitude range, or its ground speed. There was nothing in Wiggins' radarscope observations to suggest that the target plane might be in an emergency or distress condition, or in radio failure.

D711's secondary radar target was still visible on Wiggins' scope but he could not recall specifically how many miles laterally separated D711 and Cole on his scope when he made the 8:14:59 call to White. However, once he established Cole's southwest heading, he did not deem Cole to be a safety factor vis-a-vis D711 and he did not feel any urgency regarding this unidentified aircraft. Although TCA rules required that pilots be in radio contact, have an operating transponder and obtain clear-

7. Instrument flight rules (IFR) govern procedures for conducting instrument (as opposed to visual) flight. IFR is also a term used to indicate a certain type of flight plan. [ATCM, Appendix 4, Pilot/Controller Glossary, p. 21].

8. A base leg, the penultimate component of a typical traffic pattern, consists of a flight path at right angles to the landing runway off its ap-

proach end. The base leg normally extends from the downwind leg (a flight path parallel to the landing runway in the direction opposite to landing) to the intersection of the extended runway centerline, where the final approach component of the traffic pattern begins [ATCM, Appendix 4, Pilot/Controller Glossary, p. 41].

ance before entering the TCA, aircraft sometimes passed within the TCA without making the requisite radio contact. Because Wiggins was concerned that a plane was headed toward DFW without radio contact, he called White/LCW to report the traffic as a courtesy. It was also not unusual for a primary target not being worked by a controller to appear on a radarscope. The procedure in such an instance was to advise other aircraft in the area of the unworked traffic. Since D711 (and D321) had already been switched over to the LCW frequency, Wiggins passed the information on to White/LCW.

Wiggins did not recall precisely how long the Cole target remained on his radarscope, but he continued to watch it for a period of time after he told White about it because he had other aircraft inbound to the airport behind D711 (D321 followed by Delta Flight 641 ("D641"), which had been handed off to him at 8:13:40 and sequenced into the 17R traffic pattern). As Wiggins watched it on his radarscope, the Cole target continued southwest bound without changing direction and it did not appear to be on a final approach course for 17R. When White responded to Wiggins' 8:14:59 call at 8:15:03, saying that he observed Cole to be "real low," Wiggins interpreted that to mean that Cole was inside the TCA at an altitude below what would be considered a normal approach altitude at that point. At no time did Wiggins, in the radar room without any visual contact, know Cole's specific altitude.

In response to Wiggins' 8:14:59 call, White/LCW first located the Cole primary target on his radarscope and then visually confirmed an extra set of lights north of the control tower which he didn't recognize as "known" traffic. He visually determined Cole's altitude as "real low," but because Cole was four miles away, he did not know its specific altitude. White did not recall which of the several different plane lighting configurations (landing lights, rotating beacons, wing and tail lights) he saw on the Cole plane, but specifically did not recall seeing a landing light. White agreed that Cole was approximately

four miles north of DFW and confirmed his southwest heading on his radarscope. Like Wiggins, White could not determine from the primary target (or his visual observations) whether the plane was small, large or heavy. He could not determine its altitude nor its precise ground speed, though its residual trail on the radarscope established that it was very slow moving.

After his 8:15:03 call to Wiggins confirming the sighting, White, already aware that Wiggins wasn't working the plane, verbally confirmed that Medina/LCE was not working the plane either. White's radarscope showed lateral separation between Cole and D711 of less than a mile. At 8:15:11, White radioed to D711: "Delta Seven Eleven traffic at eleven o'clock less than a mile appears to be just a little bit below you nobody's working him." The D711 crew began scanning for the traffic but did not see it initially and so reported to White/LCW at 8:15:20. White responded at 8:15:22: "Alright twelve o'clock one quarter mile and he's uh merging from left to right southwest bound and he's maybe a hundred feet below you." D711's crew did not hear this transmission as they continued to scan and converse as a crew in an attempt to locate the traffic. Pankey sighted Cole first and radioed White/LCW at 8:15:32: "yeah we got him he's about a thousand feet." White acknowledged that transmission at 8:15:34.

With D711 now in visual contact with Cole and 1,000 feet vertical separation between the planes having been confirmed, White continued working other traffic. At 8:15:39, he instructed American Flight 301, already landed, to make a left turn and clear the runway. Between 8:15:46 and 8:15:54, he cleared American Flight 512 for takeoff. White/LCW advised D711 of American 512's position and cleared D711 to land with an 8:16:00 transmission.

During the 26 second interval from White's 8:15:34 acknowledgment that Pankey had sighted Cole until his 8:16:00 transmission clearing D711 for landing, the following events transpired. Dillman sighted

Cole a few seconds after Pankey did, to D711's left, at about an eleven thirty position, very low, about 20 degrees from the horizon. Cole was moving very slowly. Ground lights and moving ground vehicles in the vicinity made it difficult to see the slow moving lights. Dillman saw no landing lights. He saw a rotating beacon and one white flashing strobe light and it looked to him like Cole had just taken off from runway 17L and had turned west toward runway 17R. The D711 crew initially thought it was a helicopter sneaking under the ILS.[9] A few seconds later, a change in the plane's light pattern convinced Dillman that it was not a helicopter. He now saw two strobe lights. Dillman initiated a level off to slow his rate of descent until he could determine what Cole's intent was, and had to momentarily look inside the cabin at his instruments to do so. When he next visually observed Cole, he could see the plane's silhouette (fusilage and wings) to D711's left, sliding by from front to rear at a nine o'clock position, 500 feet below D711, on a heading approximately but not exactly parallel with D711's heading. Cole was on an intercept heading vis-a-vis D711, and a heading consistent with a landing on runway 17R. Cole's wings were level and his nose was slightly low as if in a slight descent.

It was only after the two planes had passed and he had observed Cole's silhouette and intercept heading that Dillman first considered that Cole might be going in to land and that Cole was close enough on the intercept heading to get into D711's vortices.[10] Dillman considered his options and elected to continue his descent without changing his wing condition, believing this would give Cole the optimum time and opportunity to see D711, visualize its wake turbulence and maneuver his aircraft away from the vortex.

Ten seconds after Pankey had reported Cole at 1,000 feet below D711, D711 and Cole passed abeam at 8:15:42, when their vertical separation was at least 500 feet and their lateral separation was approximately ¼ mile. Eighteen seconds later, at 8:16:00, White cleared D711 to land. D711 acknowledged that clearance at 8:16:06, also reporting "that guy [Cole] was right on the glide slope." Between 8:16:06 and 8:17:17, the controllers were communicating with each other and with D321 and D641, sequenced behind D711 in the landing pattern, regarding Cole's relative position and its effect on the jets' landing instructions, and Medina/LCE even made two "blind" radio transmissions attempting to establish contact with Cole.[11] Ground

9. The ILS, or instrument landing system, is an instrument approach system normally consisting of the following electronic components and visual aids: a "localizer" which provides course guidance to the runway; a "glide slope" which provides vertical guidance during approach and landing; an "outer marker" beacon at or near where the glide slope intercepts altitude of an ILS approach; a "middle marker" beacon defining a point along the glide slope at or near the point of decision height; and the approach lights at the airport. [ATCM, Appendix, Pilot/Controller Glossary, pp. 19, 21, 23, and 24]. DFW TCA operating rules exempt helicopters operating at or below 1,000 feet, with a letter of agreement, from the normal equipment requirements applicable to other aircraft within the TCA. [VFR Terminal Area Chart for DFW TCA, July 9, 1981 Edition, Operating Rules and Pilot/Equipment Requirements, ¶ 3; Defendant Delta's Exhibit A–1].

10. Wing tip vortices are circular patterns of air created by the movement of an airfoil through

the air when generating lift. An area of low pressure is created above an airfoil moving through the atmosphere in sustained flight. The air flowing from the high to the low pressure area around the airfoil tips tends to roll up and form two rapidly rotating vortices which are conical in shape. These "wing tip vortices" are the most predominant parts of aircraft wake turbulence. The rotational force of the vortices depends on the generating aircraft's speed, gross weight and wing loading, and the vortices of medium to heavy planes may be of extremely high velocity and pose a hazard to smaller planes. [ATCM, Appendix 4, Pilot/Controller Glossary, p. 44].

11. At 8:16:17, D321 reported its position to White/LCW and indicated "that traffic [Cole] looks like he's going right in to land." At 8:16:22, White/LCW agreed and advised D321 that no one was working Cole and D321 should continue its approach although White/LCW might have to send him around. D321 acknowledged that it had Cole in sight at 8:16:27. At

control west at DFW also contacted Meacham Airport tower, located approximately 18 nautical miles west of DFW, at 8:16:59 to find out whether anyone there was communicating with or knew anything about Cole. An independent ground witness, Robert Rice, driving his vehicle northwest on a highway located east of DFW, testified that he saw a long line of lighted planes on final approach to runway 17R, with an aircraft lower than normal altitude and to the right of the normal landing pattern. He saw the plane's navigation lights, but no landing lights. The plane, later determined to be Cole, was in straight, level flight when he first saw it. Shortly after D711 landed, the Cole vehicle did a "wingover," based on Rice's observation of the light configuration, and went into a dive. Rice reported that D711 had never been close to Cole's position, that Cole was lower than D711, and estimated the lateral separation between them to be no less than 500 feet and possibly more than 1,000 feet, based on the time interval between where D711 and Cole passed and when Cole did the "wingover," which was after D711 had landed. William and Wanda Cole were killed in the crash and resulting fire which occurred following the aircraft's dive. The aircraft impacted in a brushy area 1.7 nautical miles north of the threshold of DFW runway 17R (on centerline).

Pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b), and my prior rulings in this case, the substantive law of Michigan governs plaintiff's claim. Under Michigan law, a party is negligent for failing to do something a reasonably careful person would do or doing something a reasonably careful person would not do under the circumstances of the case. *Frederick v. Detroit,* 370 Mich 425, 121 N.W.2d 918 (1963); *Laney v. Consumers Power Co.,* 418 Mich. 180, 341 N.W.2d 106 (1983). Plaintiff has the burden of proving each element of the negligence cause of action by a preponderance of the evidence, *Dyer v. United States,* 551 F.Supp. 1266, 1276 (W.D.Mich. 1982), and the requisite elements are (1) a duty owed by defendant to plaintiff; (2) a breach of that duty; (3) proximately causing plaintiff's injuries; and (4) damages suffered by plaintiff as a result. *Roulo v. Automobile Club of Mich.,* 386 Mich. 324, 192 N.W.2d 237 (1971); *Chamberlain v. Bissell,* 547 F.Supp. 1067 (W.D.Mich.1982).

The Federal Aviation Regulations ("FARs") published in Title 14 of the Code of Federal Regulations have the force and effect of law, *Tilley v. United States,* 375 F.2d 678 (4th Cir.1967), *United States v. Schultetus,* 277 F.2d 322, 327 (5th Cir. 1960), *cert. denied.,* 364 U.S. 828, 81 S.Ct. 67, 5 L.Ed.2d 56 (1960), and violations of such regulations constitute evidence of negligence under Michigan law, *Douglas v. Edgewater Park Co.,* 369 Mich. 320, 119 N.W.2d 567 (1963); *Juidici v. Forsyth Twp.,* 373 Mich. 81, 127 N.W.2d 853 (1964).

The Airman's Information Manual ("AIM"), a quarterly FAA publication containing basic flight and air traffic procedural information, including explanations of and procedures for avoiding wake turbulence, and FAA Advisory Circular 90–23D ("AC 90–23D"), concerning wake turbulence and avoidance procedures, both constitute evidence of the standard of care for all certified pilots in the aviation community. *Associated Aviation Underwriters v. United States,* 462 F.Supp. 674, 680 (N.D. Tex.1978); *Muncie Aviation v. Party Doll Fleet, Inc.,* 519 F2d 1178, 1181 (5th Cir. 1975); *Thinguldstad v. United States,* 343 F.Supp. 551 (S.D.Ohio 1972). All pilots are charged with knowledge of those AIM and FAA advisory circular provisions pertinent to their flying activities, *Associated Avia-*

---

8:16:32, D641, already sequenced to land on runway 17R, asked White/LCW if it could sidestep to 17L. White, at 8:16:41, told D641 to continue his approach and they would advise later on his request. While White/LCW was talking to D641, Medina at LCE made two "blind" radio calls directed at Cole in an attempt to establish contact with him. At 8:16:33 Medina/LCE radioed: "Aircraft on short final, this is regional tower, how do you hear?" When he received no response, he again radioed at 8:16:38: "Aircraft, uh, light aircraft landing 17 right, if you hear regional tower, flash your landing lights." Cole again did not respond.

*tion Underwriters*, 462 F.Supp. at 680, and Cole is accordingly charged with knowledge of the contents of FAA AC 90–23D and AIM, Chapter 6, Section 3, ¶¶ 540–551 [12] regarding vortex generation, strength, behavior, and avoidance, and pilot responsibility regarding same.[13]

 The pilot in command has the ultimate responsibility for his craft's safe operation and is the final authority as to its operation. 14 C.F.R. § 91.3; *United States v. Miller*, 303 F.2d 703 (9th Cir. 1962), *cert. den.*, 371 U.S. 955, 83 S.Ct. 507, 9 L.Ed.2d 502 (1963); *United States v. Schultetus, supra.* The pilot has a continuing duty to be aware of dangers which are discernible with his own eyes and instruments. *Spaulding v. United States*, 455 F.2d 222, 226 (9th Cir.1972). During VFR weather conditions, and regardless of the type of clearance the pilot is operating under, a pilot has the primary responsibility to "see and avoid" other aircraft, specifically to maintain sufficient inflight separation to avoid collision with other aircraft and to avoid encounters with wake turbulence generated by other aircraft. 14 C.F.R. §§ 91.65(a), 91.67(a); *Wasilko v. United States*, 300 F.Supp. 573 (N.D. Ohio 1967), *aff'd*, 412 F.2d 859 (6th Cir.1969). This primary "see and avoid" responsibility logically rests with the pilot, rather than the air traffic controller, because the pilot is generally in a superior position to see other aircraft and to visualize and avoid their vortex trails. *Richardson v. United States*, 372 F.Supp. 921, 927 (N.D. Cal.

12. Pertinent provisions of AIM, Chapter 6, Section 3, on wake turbulence, provide:

¶ 540(a) ... The pilot must learn to envision the location of the vortex wake generated by large aircraft and adjust his flight path accordingly.

¶ 542(b)(3) ... The wake of large aircraft requires the respect of all pilots.

¶ 543(a) ... Trailing vortices have certain behavioral characteristics which can help a pilot visualize the wake location and thereby take avoidance precautions.

¶ 543(a)(3) ... Flight tests have shown that the vortices from large aircraft sink at a rate of about 400 to 500 feet per minute. They tend to level off at a distance about 900 feet below the flight path of the generating aircraft. Vortex strength diminishes with time and distance behind the generating aircraft. Atmospheric turbulence hastens breakup. Pilots should fly at or above the large aircraft's flight path, altering course as necessary to avoid the area behind and below the generating aircraft.

¶ 544(a) ... The probability of induced roll increases when the encountering aircraft's heading is generally aligned with the VORTEX trail or flight path of the generating aircraft. (b) AVOID THE AREA BELOW AND BEHIND THE GENERATING AIRCRAFT, ESPECIALLY AT LOW ALTITUDE WHERE EVEN A MOMENTARY WAKE ENCOUNTER COULD BE HAZARDOUS. (c) Pilots should be particularly alert in calm wind conditions and situations where the vortices could: (5) [s]ink into the flight path of VFR flights operating at 500 feet AGL [above ground level] and below. (d) Pilots of all aircraft should visualize the location of the VORTEX trail behind large aircraft and use proper VORTEX avoidance procedures to achieve safe operation. It is equally important that pilots of large aircraft plan or adjust their flight paths to minimize VORTEX exposure to other aircraft.

¶ 545(a) ... Under certain conditions, airport traffic controllers apply procedures for separating aircraft from heavy jet aircraft. The controllers will also provide VFR aircraft, *with whom they are in communication* and, which in the tower's opinion may be adversely affected by wake turbulence from a large aircraft, the position, altitude and direction of flight of the large aircraft followed by the phrase "CAUTION—WAKE TURBULENCE." *WHETHER OR NOT A WARNING HAS BEEN GIVEN, HOWEVER, THE PILOT IS EXPECTED TO ADJUST HIS OPERATIONS AND FLIGHT PATH AS NECESSARY TO PRECLUDE SERIOUS WAKE ENCOUNTERS.* [Emphasis added]

(b) The following VORTEX avoidance procedures are recommended for the various situations: (1) Landing behind a large aircraft— same runway: Stay at or above the large aircraft's final approach flight path—note his touchdown point—land beyond it.

¶ 551(a) ... Government and industry groups are making concerted efforts to minimize or eliminate the hazards of trailing vortices. However, the flight disciplines necessary to assure VORTEX avoidance during VFR operations must be exercised by the pilot. VORTEX visualization and avoidance procedures should be exercised by the pilot using the same degree of concern as in collision avoidance.

13. Mr. Brantner, Cole's flight instructor, testified that Cole had been fully informed on the topic of wake turbulence and avoidance procedures.

1974). The primary "see and avoid" responsibility remains that of the pilot regardless of whether the controller has given a landing clearance. *Kack v. United States*, 570 F.2d 754, 756 (8th Cir.1978), *aff'g*, 432 F.Supp. 633 (D.Minn.1977). Pilots are also responsible for the foreseeable damage caused by wake turbulence generated by their own aircraft, and pilots of large aircraft must plan or adjust their flight paths to minimize vortex exposure to other aircraft in the vicinity. *In Re N–500L Cases*, 517 F.Supp. 825, 834 (D.Puerto Rico, 1981).

The evidence of Cole's numerous and varied violations of the FARs, AIM and AC 90–23D during the flight of September 19, 1981, is overwhelming and essentially uncontroverted.[14] Plaintiff has accordingly conceded negligence on Cole's part. Under Michigan law, however, Cole's negligence, unless found to be the sole proximate cause of the crash, does not bar a recovery by his estate against defendant United States. *Placek v. Sterling Heights*, 405 Mich. 638, 275 N.W.2d 511 (1979). And, as previously ruled, Cole's negligence may not be imputed to Wanda Cole, his passenger, so as to reduce her estate's recovery in the event the United States is found liable.

■ The nature and extent of an air traffic controller's duty of due care to pilots is a question of law. *Miller v. United States*, 587 F.2d 991, 994 (9th Cir.1978). Air traffic controllers are held to a standard of care for the safe conduct of planes and their passengers which is concurrent with the duty of the pilot. *Spaulding*, 445 F.2d at 226.

The operational responsibilities of air traffic controllers are governed by 14 C.F.R. § 65.45(a)[15], which requires their compliance with the Air Traffic Control Manual ("ATCM"), FAA Order 7110.65B, to provide for the safe, orderly and expeditious flow of air traffic. Air traffic controllers must be familiar and comply with the mandatory provisions of the ATCM which pertain to their operational responsibilities, and the ATCM instructs them to "exercise their best judgment" when confronted with situations not specifically covered by the ATCM.[16] *In Re N–500L Cases*, 517 F.Supp. 825, 834 (D.Puerto Rico 1981).

■ Controllers have a duty to give pilots all applicable information and warnings specified in the ATCM and, in certain situations, to take steps beyond those set forth in the ATCM where necessary to assure pilot and passenger safety. *See e.g., United States v. Furumizo*, 381 F.2d 965 (9th Cir.1967), when danger to the craft is immediate and extreme; *Hochrein v. United States*, 238 F.Supp. 317 (E.D.Pa. 1965), when the controller is able to make more accurate observations or gather more information than the pilot; *United Air Lines, Inc. v. Wiener*, 335 F.2d 379 (9th Cir.1964), *cert. dismissed*, 379 U.S. 951, 85 S.Ct. 452, 13 L.Ed.2d 549 (1964), when there is a danger known only to the controller. The controller's duty to warn, however, does not relieve the pilot's primary responsibility for safe operation of the aircraft, and the pilot has a continuing duty to be aware of dangers discernible from the pilot's visual and instrument observations. *Spaulding*, 445 F.2d at 227. The controller's duty to warn does not arise unless the controller knows or should have known of a danger, and the controller has

---

14. As a representative but by no means exhaustive list, Cole violated the AC 90–23D and AIM, Chapter 6, Section 3 provisions regarding wake turbulence visualization and avoidance responsibilities and procedures; he failed to "see and avoid" the wake turbulence hazard in violation of 14 C.F.R. §§ 91.65(a), 91.67(a); he operated his plane so as to create a collision hazard vis-a-vis D711 in violation of 14 C.F.R. § 91.65(a); and he entered the DFW TCA without prior authorization in violation of 14 C.F.R. § 91.90.

15. 14 C.F.R. § 65.45(a), revised as of January 1, 1981, provides:

"An air traffic control tower operator shall perform his duties in accordance with the limitations on his certificate and the procedures and practices prescribed in air traffic control manuals of the FAA, to provide for the safe, orderly, and expeditious flow of air traffic."

16. ATCM, Forward, ¶ 1.

no duty to issue cautionary information or warnings when there is no basis from which the controller can conclude that a pilot is in a position of danger or hazard. *Richardson, supra.* Finally, controllers, in the exercise of reasonable care, have a duty to take wake turbulence hazards into consideration when giving landing clearances, *Johnson v. United States,* 183 F.Supp. 489, 493 (E.D.Mich.1960), but they are not required to anticipate or foresee negligent, grossly negligent or unlawful pilot actions, and they have a right to rely upon the assumption that pilots know and will abide by all applicable FARs, FAA advisory circulars and AIM provisions. *See, Baker v. United States,* 417 F.Supp. 471, 486 (W.D. Wash.1975); *Colorado Flying Academy, Inc. v. United States,* 506 F.Supp. 1221, 1228 (D.Colo.1981).

The ATCM, Chapter 2, Section 1, ¶ 22 provides:

"DUTY PRIORITY. Give first priority to separating aircraft and issuing safety advisories as required in this handbook. Good judgment shall be used in prioritizing all other provisions of this handbook based on the requirements of the situation at hand."

Plaintiff's controller expert, Frank McDermott, testified that the controllers in this case complied with the first priority duty initially by effectively separating D711 and Cole so as to avoid a mid-air collision, but breached their duty to give the aircraft conflict safety advisory required by the quoted provision and by ATCM, Chapter 2, Section 1, ¶ 33, providing, in pertinent part, as follows:

"33. SAFETY ADVISORY.

Issue a safety advisory to an aircraft if you are aware the aircraft is at an altitude which, in your judgment, places it in unsafe proximity to terrain, obstruction, or other aircraft. Once the pilot informs you action is being taken to resolve the situation, you may discontinue the issuance of further advisories.

\* \* \* \* \* \*

(33. Note 3.—Once the advisory is issued, it is solely the pilot's prerogative to determine what course of action, if any, he will take.)

\* \* \* \* \* \*

b. Aircraft conflict advisory—Immediately issue/initiate an advisory to an aircraft if you are aware of another aircraft at an altitude which you believe places them in unsafe proximity. If feasible, offer the pilot an alternate course of action."

Although he admitted that no particular phraseology is required in giving a safety advisory, and also admitted that White, in his 8:15:11 and 8:15:22 radio transmissions, gave D711 all information he had about Cole, McDermott still maintained that those transmissions were not the safety advisories required under these ATCM provisions. I disagree. I conclude and find that the two transmissions made by White to D711 were timely made "safety advisories" within the meaning of the ATCM, and were received and interpreted as such by the D711 crew. The tower tape transcripts and the trial testimony of Cpt. Dillman, Paul Soderlind, Delta's pilot expert, and Ray Yeager, the United States' controller expert, support this finding.

McDermott next asserted that White breached duties imposed by the visual signal provisions of the ATCM, Chapter 5, Section 2, ¶¶ 920–921. Paragraph 920 provides a table of light gun signals which controllers can give from the tower to control aircraft when radio communications cannot be employed. Paragraph 921 provides, in pertinent part:

"Direct a general warning signal to aircraft ... as appropriate, when (a) [a]ircraft are converging and a collision hazard exists ... [or] [o]ther hazardous conditions are present which call for intensified pilot ... alertness."

McDermott testified that these provisions should have been put into effect because White had Cole in view, no one had radio contact with him, and there was an urgent need to contact him. He stated that White had a duty to use the light gun to attempt to establish communication with Cole and

that he should have done so before making any call to D711 regarding Cole's presence in the TCA. In McDermott's opinion, an alternating red and green signal, the general warning signal meaning "exercise extreme caution," or a steady red signal, meaning "give way to other aircraft and continue circling," would have been appropriate under the circumstances.

I conclude and find, under the circumstances of this case, that White had and attended to a priority duty to issue a safety advisory to D711, and White's failure to give a light gun signal was neither a breach of any duty imposed by the ATCM nor unreasonable under the circumstances. White was four to five miles away from Cole, did not know his altitude and observed Cole on a southwest heading. He had no idea whether or where Cole might turn. There was no indication at that point that Cole intended a landing on runway 17R. Other traffic in the vicinity at the time included an American Boeing just ahead of D711, D711, and D321 and D641 inbound behind D711. White testified that he would have to leave his LCW tower position to work the light gun and did not feel that landing traffic which he was working at the time on runway 17R would permit him to do so. Controller expert Yeager testified that giving light gun signals to Cole prior to calling D711 to advise it of the Cole traffic, was the last thing White would ever do, since White had two-way communication with D711 and could therefore give D711 a safety advisory, a priority duty. Yeager testified that to continue to permit Cole and D711 to converge on a potential collision course in order to flash a signal without knowing if Cole could see it would be "ridiculous." Yeager testified that White's priority duty was to do precisely what he did—provide D711 with safety advisories to assure that the planes were far enough apart to avoid a mid-air collision. Once White made those calls to D711 and D711 confirmed that Cole

had been sighted "at a thousand feet," the collision hazard ceased to exist.

With respect to the wake turbulence hazard which developed after Cole turned onto a final approach heading for runway 17R behind D711, I further conclude and find that White's failure to give light gun signals to Cole at that point also did not constitute a breach of duty and was reasonable under the circumstances. McDermott admitted that no light gun signal exists to tell a pilot to be careful of wake turbulence. The recognized disadvantages of light gun signals are that the pilot may not be looking at the control tower at the time a signal is directed toward him, and the directions transmitted by such signals are severely limited, since only approval or disapproval of a pilot's anticipated actions may be transmitted.[17] Witnesses Brantner (Cole's flight instructor), McDermott and Eggspuehler all admitted that pilots are taught to circle the airport to get light gun signals and Cole was not doing so. McDermott admitted that he did not know whether Cole would have seen a light signal had one been given. During the pertinent interval, White was again attending to a recognized priority duty of assuring adequate separation between D321, D641 and Cole in the event Cole continued in for a landing.[18] Additionally, Cole's every move suggests that a light gun signal would not have worked—Cole, for a period of some fifteen minutes, flew directly at and into a line of well lighted commercial jets on a clear night, apparently without ever seeing them; he then followed directly down D711's final landing course for over one minute before the crash, apparently never seeing D711 or seeing D711 but failing to "see and avoid" its wake, since he never deviated from a course that assured a wake turbulence encounter. Under these circumstances, White's failure to give a light gun signal was not unreasonable.

McDermott next testified that under the ATCM, Cole's entry into the TCA without radio communication, at a low altitude and

17. AIM, Chapter 4, Section 3, ¶ 233(b).

18. *See* footnote 11, *supra,* and White/LCW transmissions of 8:16:22 and 8:16:41.

speed indicative, in his opinion, of an intent to land on the same runway D711 was approaching, created a potential conflict which should have been handled as an emergency under ATCM, Chapter 8, Section 1, ¶ 1550, which provides:

"1550. EMERGENCY DETERMINATIONS.

a. An emergency can be either a *Distress* or *Urgency* condition, as defined in the 'Pilot/Controller Glossary.'

b. A pilot who encounters a *Distress* condition should declare an emergency by beginning the initial communication with the word 'Mayday,' preferably repeated three times. For an *Urgency* condition, the word 'Pan' should be used in the same manner.

c. If the words 'Mayday' or 'Pan' are not used and you are in doubt that a situation constitutes an emergency or potential emergency, handle it as though it were an emergency.

d. Because of the infinite variety of possible emergency situations, specific procedures cannot be prescribed. However, when you believe an emergency exists or is imminent, select and pursue a course of action which appears to be most appropriate under the circumstances and which most nearly conforms to the instructions in this manual."

[Emphasis in original.] The ATCM Pilot/Controller Glossary defines "distress" as a "condition of being threatened by serious and/or imminent danger, and of requiring immediate assistance." [19] "Urgency" is a "condition of being concerned about safety, and of requiring timely but not immediate assistance; a potential Distress condition." [20]

White testified that at no time prior to the crash did he feel that there was an emergency situation regarding Cole's presence. He did initially believe that there

was a "potential conflict," [21] because Cole and D711 appeared to be in close proximity to each other and White did not know whether they saw each other. Once White issued the traffic advisories to D711 and D711 responded that it had Cole in sight "at a thousand feet," the potential conflict had been resolved from White's viewpoint because the potential for mid-air collision had been avoided.

Cole did not declare an emergency pursuant to ¶ 1550(b), nor, according to his flight instructor, Brantner, follow proper procedures if, in fact, he had radio failure. Brantner did not believe Cole had radio failure, and Messrs. Brantner and Eggspuehler testified that they did not believe Cole had an emergency. Yeager, himself a pilot as well as an experienced air traffic controller, testified that White was confronted with a "safety advisory" situation, not an emergency situation.

I conclude and find that White had no duty to treat the situation as an emergency. Paragraph 1550(c) says "if you are in doubt that a situation constitutes an emergency or potential emergency," handle it as such. White expressed no such doubt. He perceived the situation as a potential conflict and acted accordingly and reasonably, fulfilling his priority duty to issue traffic advisories to D711 to avoid a mid-air collision, thereby resolving the potential conflict with D711's subsequent confirmation of Cole at 1,000 feet below D711. When Cole later created another potential conflict vis-a-vis D321 and D641, who were bearing down on Cole from behind after Cole turned onto a landing heading, White again acted appropriately and in accordance with his priority duty to give traffic advisories and resolve the potential insufficient separation problems with those aircraft which were developing.[22]

---

**19.** ATCM, Appendix 4, Pilot/Controller Glossary, p. 15.

**20.** *Id.,* at p. 42.

**21.** White testified that "potential conflict" has an indeterminate number of variable meanings,

as there can be a potential conflict involving two planes taking off, two planes landing, mid-air collisions, aircraft malfunctions, unforeseen objects on the runway, etc.

**22.** *See* footnote 11, *supra.*

I further conclude and find that Wiggins had no duty to treat the situation as emergency. McDermott testified that Wiggins should have done so and should have instructed White to tell D711 to go around. Wiggins, in the windowless radar room, had observed a primary radar target five miles northeast of DFW execute a left turn to a westerly heading, and then observed the target on a southwest heading four miles north of DFW. A southwest heading was not consistent with a final approach to runway 17R. Wiggins had no way to determine and never in fact knew Cole's altitude. Wiggins never had visual contact with Cole, D711 or any other plane in the traffic pattern. Based on what he could observe from his radarscope, Wiggins, who was working several planes at the time and who had already handed D711 and D321 off to White, acted reasonably in informing White of all the information he had so that White could then make visual contact with the unidentified traffic and proceed on the basis of his visual observations. There was nothing in what Wiggins could observe from the radar target to suggest that Cole was in a distress or urgency condition.

I would note, without specifically ruling, that even if Cole's situation had been an emergency, both Wiggins and White, in terms of the actions they took, essentially complied with all duties imposed by ATCM, Chapter 8. All ¶ 1550(d) requires when a controller believes an emergency exists or is imminent is that the controller select and pursue a course of action "which appears to be most appropriate under the circumstances and which most nearly conforms to the instructions" in the ATCM. White and Wiggins and other controllers in the tower obtained and shared information from each other and from D711, D321 and D641, re-

garding Cole's position, in essential conformity with ¶ 1551.[23] In a situation such as this, where Cole was not communicating nor using normal procedures to declare an emergency or obtain a light gun signal, one (and arguably the only) way to provide maximum assistance to the Cole aircraft, as required by ¶ 1552, was to keep other planes alert to its presence.[24] As earlier stated, the failure to use a light gun to attempt to establish contact with Cole was not unreasonable under the circumstances.

McDermott suggested that White acted unreasonably in clearing D711 to land at 8:16:00. I disagree. Although Cole's heading at 8:16:00 was consistent with a landing approach to runway 17R, White did not know and could not determine Cole's specific altitude. The last time White had been advised of the relative altitudes of D711 and Cole at 8:15:32, they were vertically separated by some 1,000 feet. Because White was five miles away, Cole's ability to judge his position relative to D711 and its wake was always superior to White's. White was entitled to assume that Cole would abide by applicable FARs, AIM provisions and AC 90-23D—in other words, to assume that Cole would, if indeed going in for a landing behind D711, follow proper wake turbulence visualization and avoidance procedures. There was nothing existing at 8:16:00 which would have suggested to White that Cole would do otherwise. Dillman testified that he would not have expected White to order him to go around without knowing Cole's altitude. Further, McDermott admitted that in the cooperative air traffic system, expectations with respect to those in the traffic pattern are important and the more sophisticated the airport, the more important to keep within those expectations. As noted earli-

23. ATCM, Chapter 8, Section 1, ¶ 1551 provides: "Obtain enough information to handle the emergency intelligently. Base your decision as to what type of assistance is needed on information and requests received from the pilot because he is authorized by FAR 91 to determine a course of action."

24. ATCM, Chapter 8, Section 1, ¶ 1552 provides, in pertinent part:

"Provide maximum assistance to aircraft in distress. Enlist the services of available radar facilities and DF facilities operated by the FAA, the military services, and the Federal Communications Commission, as well as their emergency services and facilities, when the pilot requests or when you deem necessary."

er, DFW is a Group I TCA, one of the busiest airports in the United States. Several witnesses testified that White's clearance of D711 to land and D711's subsequent decision to continue with that landing both constituted predictable actions under the circumstances. McDermott also admitted that controllers' actions must be based on facts and circumstances known to them and that controllers should never guess or speculate. I am satisfied that White's decision to clear D711 for landing was based on facts and circumstances known to White at 8:16:00 and was reasonable under the circumstances.

McDermott next testified that the controllers breached duties under ATCM, Chapter 6, Section 2, ¶ 1420, regarding minimum radar separation between small and large planes. Paragraph 1420 provides, in pertinent part:

"b. TERMINAL: Separate an aircraft landing behind another aircraft on the same runway ... by ensuring the following minima will exist at the time the preceding aircraft is over the landing threshold: (1) Small behind large—4 miles."

McDermott stated that once Cole had been observed on radar to have turned to a heading consistent with a landing on runway 17R, where D711 was to be landing, the controllers then had a duty, under ¶ 1420(b)(1), to position Cole four miles behind D711 when D711 crossed the runway threshold. Because the controllers could not communicate with Cole, McDermott testified that the only way to assure this minimum separation was to revoke D711's landing clearance and order D711 to go around, thereby removing the wake turbulence from in front of Cole.

McDermott admitted that under the prevailing VFR conditions, Cole had primary responsibility to provide his own wake turbulence separation under the FARs, and that this is what he would be expected to do under normal conditions. McDermott, however, insisted that the controllers still had a responsibility to resolve the "potential emergency" posed by D711's wake turbulence. It was his opinion that neither Wiggins nor White considered the possibility of a wake turbulence encounter, although the possibility of such an encounter should have been apparent to them from the circumstances of Cole's entry into the TCA and Cole's positioning of himself to assure an encounter with D711's wake. McDermott concluded that Wiggins should have continued to watch the Cole target on his radar after his 8:14:59 call to White, and thereafter should have advised White of the imminent wake turbulence hazard and insisted that White instruct D711 to go around. White himself should have diverted D711 by ordering him to go around, according to McDermott. McDermott testified that the controllers' failure to order such a diversion breached duties owed to Cole under ATCM, Chapter 6, and Chapter 2, Section 1, ¶ 22, the latter being the priority duty to separate aircraft.

As a preliminary matter, McDermott's reliance on ATCM, Chapter 6, Section 2, ¶ 1420(b)(1) is misplaced. For the radar separation minima stated therein to apply, under both the ATCM and AC 90–23D, the controllers must have communication with both planes. Those radar minima are inapplicable when the following aircraft is neither communicating with nor being radar vectored by the control tower. *See United States Aviation Underwriters, Inc. v. United States,* 16 Av.Cas. (CCH) P18,288 (D.Colo.1981).

Captain Dillman testified that once the planes had passed abeam, he realized that his wake was potentially hazardous to Cole. He reviewed his options in the milliseconds available to him and made the decision to continue with his landing, believing that action gave Cole the best time and opportunity to see and avoid D711's wake. Dillman knew the relative altitudes of the two planes (White and Wiggins did not) and stated that he would not expect an air traffic controller to order him to go around without knowing Cole's altitude. Dillman stated that it was his responsibility, not that of the controllers, to make the "go

around vs. continue landing" decision under the circumstances of this case.

White testified that at the time of the 8:16:06 transmission by D711, White thought Cole presented a potential separation conflict with D321, the next plane in the landing sequence, since if Cole did, in fact, attempt to land on runway 17R, there would not have been enough runway road for the faster D321 to land behind Cole without overtaking him. White attended to this potential separation problem.[25] Yeager testified that D711 had already passed Cole when the 8:16:06 transmission was made indicating that Cole was right on the glide slope. He asserted that at and after that time, the controllers had no control over separating Cole from D711's wake. He stated that there was no way to issue a wake turbulence warning to Cole with a light gun. He emphasized that White never knew Cole's altitude. Because VFR conditions prevailed, Yeager asserted that it was solely the following pilot's responsibility to visualize and maintain his own wake turbulence separation. Yeager stated that during the interval in question, White had a priority duty to D321 and D641 to apprise them of the traffic and the possibility that their landing instructions might be altered depending on what Cole did. Yeager testified that White acted prudently and properly in attending to this priority duty.

Eggspuehler, on cross-examination, admitted that the interval from the time D711 passed Cole until the first wake turbulence encounter was 30–45 seconds and that during the interval, Cole had complete control over where his plane went and had sufficient time to execute a 90 degree turn away from the vortex. He admitted that even if Cole hadn't seen D711 before, if Cole was indeed on a final approach to runway 17R, he would have been looking at the runway, could not have missed seeing D711 landing ahead of him, should have known that D711's wake turbulence would be a hazard and should have used the 30–45 seconds he had to extricate himself from it.

Tymczyszyn, an experienced test pilot, testified that D711 followed the wisest course once the two aircraft had passed abeam. He asserted that it was reasonable for D711 to continue the approach and landing because this option created the weakest vortex, was predictable, and most rapidly reduced the wake turbulance hazard to Cole. In Tymczyszyn's opinion, if D711 had done a straight and level go around in a landing configuration, he would have dragged his vortex the rest of the approach path, generating a vortex continually and laying it below him; if D711 had done a straight and level go around but had "cleaned up" the aircraft by bringing in his flaps and gears, he would have created a stronger vortex and would have been doing a highly unpredictable maneuver since a "go around" is usually a crisp, quick maneuver. Soderlind, Delta's pilot expert, also testified that Dillman's only option was to continue with his landing, because that option permitted Cole to go under D711 to the right or left and miss the wake turbulence, or use an angling approach until he was past D711's touchdown point, in either event negating any possibility of encountering D711's vortex. Although Gregorek's testimony conflicted with that of Tymczyszym and Soderlind (and implicitly with that of Dillman and Yeager), I found Gregorek's testimony unpersuasive.[26]

---

**25.** *See* footnote 11, *supra.*

**26.** Gregorek testified that if D711 had continued in a straight line rather than continuing its landing, D711's wake turbulence would never have reached and settled on Cole and Cole would have landed safely. Gregorek's credibility was seriously damaged on cross-examination, when he admitted that he had neither reviewed nor was familiar with the AIM and ATCM aircraft classifications for wake turbulence purposes. He admitted that his charts and calcula-

tions assumed a 300'/minute wake turbulence sink rate with the wake turbulence stabilizing 300' below a 727 aircraft. Publications relied upon by controllers and pilots alike, however, including AC 90–23D, reflected that the sink rate for 727 vortex was 400–500'/minute until the turbulence stabilizes at 900' below the plane. Gregorek also prepared his charts and made his calculations assuming that D711's flaps were up when, in fact, they had been down, a difference which sharply affects vortex strength, since a

Based upon the foregoing testimony, I conclude and find that the controllers acted reasonably under the circumstances and did not breach any duty under ATCM, Chapters 2 or 6. It is apparent to me from the testimony of Messrs. Dillman, White, Yeager, Soderlind, and Tymczyszym, which I credit over that of Messrs. Gregorek, McDermott and Eggspuehler, that the "go around" McDermott insists should have been ordered by the controllers, viewed at that time, would likely have been more detrimental to Cole than the course of action White and then Dillman chose to follow. A "go around" would also have been the unpredictable move from the standpoint of traffic pattern expectations. I am satisfied that the conduct of Wiggins and White after Cole turned onto a heading for a landing on runway 17R conformed with priority duties imposed by the ATCM and was reasonable under the circumstances then existing and the information then known to them.

McDermott was the only witness contending that the controllers acted unreasonably. Implicit in my holding is my rejection of his testimony as unpersuasive. White and Wiggins, journeymen air traffic controllers with years of experience between them,[27] exercised their best judgment on September 19, 1981, in accordance with the mandate of the ATCM, based on circumstances then confronting them and limited information then available to them. McDermott last controlled traffic as an un-

supervised air traffic controller in 1953 when commercial jets were not even in operation and there was no radar in the actual environment. He has had no FAA training since 1953. He has never worked in a tower as a journeyman air traffic controller, has never used tower radar to clear traffic, has never cleared any traffic to land or takeoff, nor applied the ATCM and/or AIM provisions applicable in this case. McDermott nonetheless insists upon a rigid interpretation of the ATCM. He insists that mandatory ATCM provisions applied to preclude the exercise of any independent judgment by the controllers, or, alternatively, that even if the controllers were permitted to exercise independent judgment, that the judgment exercised by them was deficient.

The decisive issue in this case is whether White and Wiggins acted properly, reasonably and in conformity with applicable duties imposed upon them by the ATCM under the circumstances which existed. I find and conclude that they did in all respects. I reach this conclusion because I cannot credit McDermott's hindsight opinion that other actions by the controllers might have avoided the crash and should have been undertaken above the cumulative testimony of most of the other witnesses to the implicit effect that the controllers properly and reasonably responded to the situation confronting them. Nor can I credit McDermott's opinion above that of

clean wing produces a stronger vortex while lowered flaps create a more diffuse vortex system. Gregorek admitted various other mistaken assumptions and miscalculations. The cumulative effect of his admissions was to seriously undermine the reliability of the vortex encounter charts, Plaintiff's Exhibits 57 through 59, and to diminish the persuasiveness of Gregorek's opinions and conclusions based on those charts. Additionally, although presented as plaintiff's wake turbulence expert, Gregorek admitted that he is neither a pilot nor a journeyman air traffic controller, and although he instructs on the subject in his capacity as a professor in the Department of Aeronautical and Astronautical Engineering at Ohio State University, Gregorek admitted that he has neither researched nor published any articles on the subject of wake turbulence.

27. White worked continuously as an FAA air traffic controller from the late 1950's or early 1960's until his retirement in March 1984, except for 10–12 months of sick leave prior to his retirement. The last 16–17 years of his employment were at DFW. He was qualified and had been certified for all DFW radar room and tower cab positions for several years prior to September 19, 1981. Wiggins was hired by the FAA in 1960 and worked at various airports before moving to DFW in 1975. From June, 1975 until May, 1982, he was qualified for all positions in the DFW tower cab and he was qualified and certified for all radar room positions for approximately 7 or 8 years prior to September 19, 1981. He testified that he worked all positions in the radar room on a regular basis.

Yeager. Yeager found no instance where White or Wiggins acted unreasonably, imprudently or in violation of any ATCM duty on September 19, 1981, and Yeager's opinion was infinitely more persuasive than McDermott's. It was based on close to 36 years of government employment in the air traffic control field and expertise developed as chief of the FAA Air Traffic Service System Error Analysis Branch from January 1, 1972 to January 5, 1975, and as chief of the FAA Air Traffic Service Accident/Incident Analysis Branch from 1975 until his retirement in January 1980. Yeager had previously qualified and been fully certified in all facets of the air traffic control system, was expert in the use of both terminal and center long range primary/secondary radar systems and computer automated air traffic systems, and he had coordinated and assisted in recommending, developing and implementing many of the air traffic procedures found in the ATCM.[28]

## CONCLUSION

The jury previously found that defendant Delta was not negligent in this case and final judgment in favor of Delta was entered on February 12, 1986. I now find and conclude that plaintiff has failed to prove, by a preponderance of the evidence, that the United States' air traffic controllers breached any duty owing to decedents, or acted other than properly and reasonably under the circumstances existing on September 19, 1981. I therefore conclude and find that the sole proximate cause of the September 19, 1981 crash and resulting death of Mr. and Mrs. Cole was the negligence of Cole himself in, among other things, improperly entering a busy commercial air pattern without advance notice or approval and specifically failing to exercise due care to see and avoid D711 and its resulting wake turbulence. Plaintiff's complaint against defendant United States shall therefore be dismissed, with full prejudice, and judgment shall be entered in favor of the United States, with costs as permitted by law.

---

**28.** Defendant United States' Trial Exhibit No. 3, Yeager Resume.