79 F.3d 1465
 Phillip R. and Edna CAPPELLO, individually and Phillip R.
Cappello as Administrator of the Estate of Kirk P.
Cappello, Plaintiffs-Appellants,
v.
DUNCAN AIRCRAFT SALES OF FLORIDA, Inc., Defendant-Appellee.
 No. 94-5543.
 United States Court of Appeals,
Sixth Circuit.
 Argued June 12, 1995.
Decided March 27, 1996.
 
 On Appeal from the United States District Court for the Middle District of Tennessee; Thomas A. Wiseman, Judge.
 Charles G. Walker, Baker, Donelson, Bearman & Caldwell, Memphis, TN, Maclin P. Davis, Jr. (argued and briefed), Heiskell, Donelson, Bearman, Adams, Williams & Kirsch, Nashville, TN, John Russell Heldman (briefed), Franklin, TN, for plaintiffs-appellants.
 Cynthia C. Hollingsworth (argued and briefed), Virginia W. Pennington, Gardere & Wynne, Dallas, TX, for defendant-appellee.
 Before: MERRITT, Chief Judge; MARTIN, Circuit Judge; SIMPSON, Chief District Judge.*
 MERRITT, Chief Judge.
 
 
 1
 This diversity case for wrongful death arises from an airplane crash. The parties agreed that the substantive questions in the case are governed by Tennessee law.
 
 
 2
 At 1:42 in the early morning of March 16, 1991, in fair weather, the pilot of a small "Hawker" jet chartered from the defendant flew into the side of a 3,500 mountain two minutes after taking off from a closed airport in San Diego. All nine people on board were killed. The pilot, Donald Holmes, had chosen to take off at night in a mountainous area under the visual flight rules ("VFR") of the Federal Aviation Administration, rather than the instrument flight rules ("IFR"). Federal Aviation Administration General Operating and Flight Rules, 14 C.F.R. §§ 91.151-91.159 (Visual Flight Rules) and 14 C.F.R. §§ 91.167-91.193 (Instrument Flight Rules) (1995). He was therefore not under the direction or control of an FAA controller, and consequently, he had received no radio instructions or clearances before the crash. Under these circumstances of VFR flight, as explained in more detail below, the pilot in command had the sole responsibility to maintain eye contact with the ground and to avoid obstructions. 14 C.F.R. § 91.3 ("The pilot in command of an aircraft is directly responsible for, and is the final authority as to, the operation of that aircraft."); 14 C.F.R. § 91.13 ("No person may operate an aircraft in a careless or reckless manner so as to endanger the life or property of another."); December 13, 1990, Airman's Information Manual Rule 407(a) ("When meteorological conditions permit, regardless of type of flight plan or whether or not under the control of a radar facility, the pilot is responsible to see and avoid other traffic, terrain, or obstacles.") and Rule 325(b)(5)(a) ("When climbing in visual conditions it is the pilot's responsibility to see and avoid obstacles."). The defendant corporation, Duncan Aviation, had chartered the plane and provided the pilot in order to carry a band for country music singer, Reba McEntire, to her next concert engagement. The plaintiffs' decedent in this wrongful death action was the band leader, Kirk Cappello. Able counsel for the defendant declined to admit that pilot negligence was the cause of the accident and sought successfully at the jury trial below to shift responsibility to two nonparty FAA employees on the basis of comparative negligence. The plaintiffs, the parents of the deceased band leader, assign as error on appeal the decision of the trial judge to allow this comparative negligence defense to go to the jury. The jury found the pilot who flew into the mountain only 45% responsible, attributing 55% of the responsibility for the crash to the FAA employees. After the deduction for FAA negligence, the jury awarded plaintiffs $329,773 in damages against defendant for their son's death.
 
 
 3
 The plaintiffs also assign as error two other trial decisions of the district court, the decision to grant judgment for the defendant on the question of punitive damages and the comments of the trial judge to the jury advising that in the judge's opinion the plaintiffs' most important expert witness on the issue of the defendant's liability lacked credibility and was not testifying in good faith.
 
 
 4
 We will consider these trial issues in detail before reviewing the other assignments of error which are in the main related to the damage award.
 
 
 5
 I. The Issue of the Negligence of the Two FAA Employees
 
 
 6
 The record discloses that this airplane crash took place under the following circumstances. In San Diego, the main commercial airport, Lindbergh Field, closes at 11:00 P.M. and does not allow airplanes to take off at night thereafter. Airplanes can take off in San Diego late at night from Brown Field, a former Naval air station adjacent to the Mexican border which has been converted into an airport for private planes. The entire airport at Brown, including the control tower, closes early and was not open when the defendant's jet took off with the band at 1:40 A.M. on the morning of March 16, 1991. The record does not disclose why the pilot decided to take off late at night from a closed airport rather than waiting until the next day, nor does it disclose why he chose to take off in the jet at night flying toward a mountainous area under visual flight rules instead of using an instrument departure route. The record does not specifically disclose the pilot's level of physical and mental fatigue, although it does show that he flew the chartered jet from its home base in Alabama arriving in Gallatin, Tennessee, well after midnight the night before. Then for most of the day on March 15, 1991, he flew the plane from Tennessee to San Diego stopping once in between for fuel. The record discloses that the pilot was an experienced and reputable jet pilot with 15,000 hours of total time in many types of airplanes.
 
 
 7
 It is elementary, and required by FAA rules, that a pilot in such circumstances have detailed aviation VFR and IFR maps for the San Diego area showing the terrain, the location of the Terminal Control Area (TCA)[1] and other restricted areas, as well as instrument approach and departure routes, radio communication and navigation frequencies, the location of radio and visual navigation aids and checkpoints and the local procedures for filing instrument flight plans and obtaining instrument flight clearances. 14 C.F.R. § 91.503(a) ("The pilot in command of an airplane shall ensure that the following flying equipment and aeronautical charts and data, in current and appropriate form, are accessible for each flight at the pilot station of the airplane: ... (4) for IFR, VFR over-the-top, or night operations, each pertinent navigational en route, terminal area, and approach and letdown chart.") The FAA rules require that a pilot study the maps and manuals carefully and digest all of the information necessary for safe flight. 14 C.F.R. § 91.103 ("Each pilot in command shall, before beginning a flight, become familiar with all available information concerning that flight.").
 
 
 8
 There are detailed sets of assumptions, customs and patterns of conduct shared by pilots and FAA flight assistants, and in the end, the comparative negligence problem in this case is about whether the FAA employees failed to comply properly with this set of shared assumptions and expectations. These assumptions and expectations arise from hundreds of FAA rules and guidelines covering different flight situations and the customary way they have come to be applied in the flying community. Under FAA rules, all FAA "Flight Specialists" on the ground in so-called "Flight Service Stations," who give pilots weather and other flight information,[2] and all "controllers" who direct pilots in the operation of aircraft under their positive control when underway, are entitled to assume that pilots with whom they communicate have complied with FAA regulations and have studied the basic maps of the area, know the terrain and the navigational facts concerning departure routes, TCA's, clearances and the like. 14 C.F.R. § 91.103; Redhead v. United States, 686 F.2d 178, 183 (3rd Cir.1982), cert. denied, 459 U.S. 1203, 103 S.Ct. 1190, 75 L.Ed.2d 435 (1983); December 13, 1990 Airman's Information Manual Rule 325 (Note) ("The term Radar Contact, when used by the controller during departure, should not be interpreted as relieving pilots of their responsibility to maintain appropriate terrain and obstruction clearance.").[3] Rule one makes it clear that the pilot in command, like the ship captain, has the ultimate responsibility for the safety of his plane and his passengers and must comply with the extensive body of regulations published by the FAA. 14 C.F.R. § 91.3; In re Air Crash Disaster at New Orleans, 544 F.2d 270, 276 (6th Cir.1976).
 
 
 9
 VFR flight is limited to fair weather flying. 14 C.F.R. § 91.155. The pilot under VFR flight rules may not fly through clouds or in weather in which the ceiling is low or the visibility is bad. Id. Within this framework, pilots may fly night or day wherever they want so long as they do not fly into restricted areas like TCA's. 14 C.F.R. §§ 91.126-91.135. The VFR pilot need not remain under the "positive control" or guidance of an FAA air controller[4] but must ordinarily maintain visual contact with the ground and obstructions to flight. Joseph Duncan himself, the President of defendant company Duncan Aircraft Sales of Florida, testified that, "... VFR, you don't even have to call anybody. You can just take off and go." Transcript of Trial, Vol. III, at 590.
 
 
 10
 In contrast, IFR flights are always under the positive control of a controller whether the weather is good or bad, and pilots are dependent on their instruments for navigation. 14 C.F.R. § 91.173 ("ATC clearance and flight plan required. No person may operate an aircraft in controlled airspace under IFR unless that person has (a) Filed an IFR flight plan; and (b) Received an appropriate ATC clearance."). The 1990 Airman's Information Manual makes it very clear that terrain and obstruction clearance is not provided by Air Traffic Control until the controller begins to provide navigational guidance (i.e. Radar Vectors). Rule 325 (Note). Thus, a critical factor in determining both the duty owed by Kessock and Hughes and whether that duty was breached is that the pilot decided to take off under VFR.
 
 
 11
 The case of Biles v. United States, 848 F.2d 661 (5th Cir.1988), describes a somewhat similar accident and undertakes to explain a few of the assumptions and expectations that pilots share with FAA assistants. The trial court in Biles refused to allow the question of the controller's negligence to go to the jury, and the Fifth Circuit affirmed. In Biles the pilot of a prop-jet took off VFR from the Chattanooga airport and flew the plane into Lookout Mountain at an altitude of 2,000. The pilot was flying VFR in bad weather. He established contact with and came under the "positive control" of Chattanooga departure control. As is normal for VFR flights, the controller terminated radar services and positive control when the aircraft left the controller's sector of radar surveillance. The controller did not pass the pilot on to the controller of the next sector, as would be the case in IFR flight. The plane crashed shortly after radar service ended. The complaint asserted that the controller had an affirmative duty to warn the pilot of the mountainous terrain because the plane was flying toward Lookout Mountain in bad weather conditions at an unsafe altitude. The Fifth Circuit made it clear that in such circumstances the pilot in command, who chooses to fly VFR, is responsible to maintain visual contact with obstructions.
 
 
 12
 The Biles court correctly applied the principle that controllers must be able to assume that pilots are complying with FAA regulations and understand their circumstances in the absence of a pilot request or other notice to the contrary:
 
 
 13
 "The controller had a right to assume that in the absence of evidence to the contrary, conditions were such that the aircraft could operate under visual flight rules. He would expect that out of concern for their lives, if for no other reason, the crew members were flying in conformance with FAA regulations." Redhead, 686 F.2d at 183. Thus, the controller, here, was entitled to assume that the pilots could see the terrain themselves.... The problem in this case seems to be that the pilots had taken an unwarranted risk in flying VFR and may even have misrepresented flying conditions as permitting VFR flight. "The pilot of an aircraft is in control of the flight ... decisions that depend upon conditions known in detail only by the pilot must be made by him." Id. .... [The controller] had no means to assume their lack of preparedness.
 
 Biles, 848 F.2d at 663 n. 4.[5]
 
 14
 Numerous circuits, including our own, have similarly held that under VFR conditions, the pilot has primary responsibility to avoid collisions:
 
 
 15
 Recorded cases clearly state the legal duty, that although air traffic controllers must exercise reasonable care, "under VFR [visual flight rules] conditions, the primary responsibility for safe operation of the aircraft rests with the pilot, regardless of traffic clearance." Coatney v. Berkshire, 500 F.2d 290, 292 (8th Cir.1974).
 
 
 16
 Schuler v. United States, 868 F.2d 195, 197 (6th Cir.1989).
 
 
 17
 A. The Conduct of Flight Specialist Ronald Kessock
 
 
 18
 The pilot had decided to fly his passengers out of the closed airport at Brown Field late at night VFR, near a mountain range. Although obviously more dangerous than daytime flight, FAA regulations permit such nighttime VFR flights. 14 C.F.R. §§ 91.151-159. While waiting at Brown Field, the pilot called the San Diego Flight Service Station at 7:20 P.M., again at 7:53 P.M. and then again at 8:25 P.M.
 
 
 19
 Defendant's expert Beaudoin, using the somewhat confusing nature of the conversations between the pilot and the flight specialist, testified that the flight specialist in this case was negligent.[6] First, Beaudoin asserted, incorrectly, that Kessock suggested that the pilot take off VFR.[7] Second, Beaudoin testified, inaccurately, that Kessock told the pilot it would be safe to take a route to the northeast at an altitude of three thousand feet. Transcript of Trial, Vol. IV, at 802, 804. Finally, Beaudoin testified that Kessock undertook to approve the pilot's takeoff plan, and in doing so, failed to provide safe and accurate information. Id. at 804. This assertion is also inaccurate.
 
 
 20
 The transcripts of the conversations between the pilot and Kessock reveal that Beaudoin's attribution of negligence to Kessock is totally unfounded. The first two conversations lasted approximately four minutes each and the third lasted three minutes. In the first conversation the pilot filed a flight plan for departure at midnight with Amarillo, Texas, as the destination and with a cruising altitude of 37,000.[8] The flight plan further provided for a VFR takeoff from a closed field with the pilot after takeoff to check in while in the air with San Diego departure control for his clearance for a further IFR flight to his destination. In the first call, Kessock asked the pilot, "are you familiar with the Brown Field departure, sir," to which the pilot replied, "No, not really," but then said he had the necessary charts and, "I'll just look it up in the approach plates." In the first conversation, the pilot in his flight plan specified a VFR or visual departure from Brown Field rather than specifying a time for a designated instrument departure takeoff. (After taking off under visual flight rules, the pilot may then communicate with a FAA departure controller for clearance to fly in accordance with his instrument flight plan to his destination.)
 
 
 21
 In his second call to the San Diego Flight Service Station, the pilot said to Kessock that he was unable to find the required charts showing the departure routes from the field. The pilot was at first uncertain which way he would depart on the east-west runway at Brown Field, but he then tentatively advised Kessock that he would depart to the east on runway 8.[9] Since the pilot said he did not have the required charts showing recommended departure routes, Kessock then read the departure plate to the pilot word for word. He gave him the correct departure route for 8 to the east, including all of the radio signals and radials the pilot should follow during his climb out. The pilot indicated that he had copied and understood the departure routing. Then the pilot seems to change his mind about the runway on which he will depart. The following conversation about this matter concluded the second telephone call:
 
 
 22
 0756:55 Pilot Ok. What is, what is two six [meaning what is the departure routing for takeoff to the west on runway 26]?
 
 
 23
 0756:56 Kessock Ok. Two six runway two six departure climbing right turn heading 280 cross Mission Bay vortac [a radio signal] radial [compass heading from the radio signal] 130 at or above 1,500 [feet above sea level] intercept the Mission Bay Vortac radial 160 at or above 3,000 direct Mission Bay vortac.
 
 
 24
 0757:21 Pilot Ok. All right. That'll do me.
 
 
 25
 In the third telephone call to the Flight Service Station, the pilot told Kessock that he now had found the departure charts. He again said that he will be leaving VFR in accordance with his previous flight plan and that he wants to be sure to stay below the restricted air space of the TCA which has a floor beginning at 3,000. This segment of the TCA would be immediately to the north of his departure route if he used runway 26 to the west. The pilot said near the end of this conversation, "so I would be better off if I headed right northeast and stayed down below 3,000," to which Kessock replied, "Yeah, sure, that'll be fine." At the end of the previous conversation thirty minutes earlier, the pilot had indicated that he would depart runway 26 to the west. His question to Kessock about staying below the TCA on his VFR takeoff indicates he still plans, four hours before takeoff, to depart on runway 26 to the west because he indicates after takeoff that he will be "headed right" to the "northeast" and staying below the TCA. The pilot's question would make no sense to Kessock or anyone who speaks in the vernacular of pilots if the pilot intended to leave on runway 8 to the east. It would make no sense because a pilot leaving on runway 8 headed east would not turn "right" to go northeast and because the bottom or floor of the TCA immediately north of the runway 8 departure course was at 5,800, not 3,000 as would be the case with the segment of the TCA north of the runway 26 departure.
 
 
 26
 A review of the San Diego charts shows that the pilot could have departed to the east on runway 8 flying to 18,000 straight out using the runway heading without coming in contact with the TCA or having to remain at an altitude below the tops of any mountains in the area. It is a mystery why the pilot decided to turn left under visual flight rules after departing runway 8 to the east and fly northeast toward the mountains.
 
 
 27
 If Kessock had concluded that the pilot was confused and intended to turn left into the mountains after a takeoff from 8 to the east, he might have said, "Sir, you can avoid danger by taking off on 8 to the east and climbing straight out on runway heading to a safe altitude above the mountains." But Kessock had no reason to believe that the pilot had not read the required charts and did not know this elementary fact. Kessock gave the pilot no misinformation about the TCA, departure routes, weather or terrain. The pilot said to Kessock that he had the necessary charts, and Kessock, under standard assumptions and expectations that pilots and FAA assistants share, was entitled to assume that the pilot had read them and knew where the mountains were located in relationship to the airport.
 
 
 28
 There is no basis whatever for a finding that Kessock's conduct was negligent or a valid proximate cause of the pilot's mistakes. The argument of able defense counsel as well as the testimony of defendant's expert, Beaudoin, conflicts with the record of the conversations between the pilot and Kessock. Thus the trial judge should not have allowed this defense of comparative negligence on the part of Kessock to go to the jury, and the jury verdict finding Kessock 27-1/2% responsible for this aircraft accident must be set aside.[10]
 
 
 29
 B. The Conduct of Departure Controller Hughes
 
 
 30
 The pilot took off on runway 8 and hit the mountain 2 to 3 minutes later. He did not contact the air traffic controller, however, until a mere forty-five seconds before the crash. Defendant's assertions that during that forty-five second span Hughes was obligated to give the pilot a clearance, determine that he was headed in an unsafe direction and give instructions such that the accident would be averted are not supported by the record. Therefore, the submission of the comparative negligence defense as to air traffic controller Hughes was also error.
 
 
 31
 In order for a plane to be come within the positive control of an air traffic controller, it must first establish radio contact.[11] Once radar contact is established, the radar surveillance system allows the controller to clear the aircraft, give the pilot instructions and warnings, and maintain physical separation between aircraft. Until radar contact is established and a clearance received from the controller, the pilot does not ordinarily receive instructions and warnings from the controller.[12] Experienced pilots are familiar with these elementary facts.
 
 
 32
 The complete communications after takeoff between the pilot and the departure controller, Jim Hughes, as shown on FAA tapes, was:
 
 
 33
 1:41:34 A.M. Pilot San Diego departure, eight three one lima charlie
 
 
 34
 1:41:43 Hughes hawker one lima charlie go ahead
 
 
 35
 1:41:45 Pilot yes sir this is hawker eight three one lima charlie just off brown field standing by for our ifr to amarillo
 
 
 36
 1:41:52 Hughes eh your clearance clocked out here let me put it right back in i'll be right back with you
 
 
 37
 1:42:16 Hughes one lima charlie squawk zero three zero six and ident
 
 
 38
 1:42:19 Pilot zero three zero six coming down
 
 
 39
 [The crash occurred a few seconds later.]
 
 
 40
 The plane crashed into the mountain between 1:42 A.M. and 1:43 A.M. The phrase, "clocked out," refers to the fact that under FAA rules in the San Diego area, a flight plan filed with the FAA is cancelled if not called up and used within an hour and a half after the stated time for takeoff or check-in specified in the flight plan.[13] The pilot, in the flight plan filed with Kessock, stated that he would take off and check in while in the air at midnight. Since the FAA flight computer system had cancelled the plan by 1:41 A.M., controller Hughes--the only controller on duty at this time of night--turned around from his radar screen to re-enter the flight plan in the FAA computer system prior to establishing radar surveillance and giving the pilot a clearance and a compass heading and an altitude. While Hughes was re-entering the flight plan, he did not follow the airplane on his radar screen. He had given the pilot a squawk to put in the transponder in preparation for radar contact. But he did not see that the plane was heading to the northeast and was about to fly straight into the mountain.
 
 
 41
 In order to take positive control of the aircraft and in order to be in position to hand off the plane in a few minutes to the next controller down the road for instrument flight following, Hughes was required to refile the flight plan and re-enter it into the computer system. FAA Order 7220.2A § 30-78. Hughes had to re-enter the flight plan because the pilot had not himself kept his flight plan current by updating it within an hour and a half before takeoff. In clocking the plane back into the computer, Hughes followed standard FAA procedures. Id.
 
 
 42
 The defense argument that Hughes was negligent is just as off base as their argument that Kessock was negligent. First, Defense counsel and his expert witness, Beaudoin, argued below that Hughes was negligent in failing to clear the airplane immediately for instrument flight so he could follow its path. If Hughes had done so, rather than re-enter the "clocked out" flight plan, he might have had time to notice that the plane was flying at an unsafe altitude and in an unsafe direction toward the mountains. Although Hughes could have given the pilot an IFR clearance after establishing his position by radar identification, Hughes was also obligated to refile the pilot's flight plan which the pilot allowed to lapse.[14] Positive control and clearance for instrument flight does not begin until a squawk is transmitted from the plane's transponder and the controller announces radar contact and provides a clearance. Airman's Information Manual Rule 325 (Note) ("Terrain/obstruction clearance is not provided by ATC until the controller begins to provide navigational guidance, i.e. Radar Vectors.") Defendant admitted that the plane was not "under the control" of Hughes at the time of the crash. Transcript of Trial, Vol. IV, at 911. Thus, the assertion that Hughes was negligent in failing to guide him away from the mountain has no basis in fact.
 
 
 43
 Second, Defendant's expert asserted that Hughes should have issued a safety warning to the pilot. This assertion is equally baseless. The Airman's Information Manual indicates that a controller "[i]ssues a safety alert to an aircraft under his control if he is aware the aircraft is at an altitude believed to place the aircraft in unsafe proximity to terrain, obstructions, or other aircraft." December 13, 1990 Airman's Information Manual Rule 407(b). The aircraft, as defendant admitted, was not under Hughes' control. In addition, Hughes did not know that the plane was in danger and had no reason to assume that it was.[15] Thus, there is no basis to assert that he should have issued a safety alert in this case.[16]
 
 
 44
 Taking the evidence in the light most favorable to defendant, and giving defendant the benefit of every reasonable inference, no factual basis exists for a finding of negligence on the part of Hughes and Kessock. Beaudoin's testimony to the contrary is spurious and not based on an accurate portrayal of the rules and customs of the flying community. Able defense counsel's arguments on this issue in the court below and on appeal, though emphatic, are similarly flawed. The court below erred in permitting a comparative negligence defense. The legal fault here is solely the defendant's, under the doctrine of respondeat superior. The portion of the jury verdict finding the FAA employees at fault must be set aside.[17]
 
 II. The Punitive Damages Issue
 
 45
 In Tennessee, after the case of Hodges v. S.C. Toof and Co., 833 S.W.2d 896 (Tenn.1992), punitive damages may be awarded only for purposes of punishing the defendant in "cases involving only the most egregious wrongs." Id. at 901. The only function or purpose of punitive damages now in Tennessee is punishment for serious moral dereliction. Gross negligence is no longer sufficient. The tort must be intentional or fraudulent or a species of recklessness that contains an element of "conscious" wrongdoing. The plaintiff under Tennessee law must show by "clear and convincing evidence" that the defendant "is aware of, but consciously disregards, a substantial and unjustifiable risk" in a "reckless" way. Here the pilot was guilty of gross negligence in carrying out his piloting responsibilities. But there are several factors that militate against allowing an award of punitive damages. The plaintiff has introduced no evidence that justifies punishing the defendant's conduct independently of the pilot's action. The pilot is dead and cannot be punished. The pilot was aware of the mountains and the dangers of night VFR flight into them, but the evidence is completely unclear about why the pilot became disoriented. Disorientation under such circumstances clouds consciousness and the kind of purposeful conduct implied by the malice standard now in use in Tennessee. The most likely explanation for the pilot's terrible mistake is fatigue and the pilot's lack of self-awareness of his impaired state of mental and physical alertness. But the pilot's inability to understand his own tiredness and his lack of mental and physical responsiveness--if this was the cause--is inconsistent with malice or the type of "conscious" disregard of the danger contemplated by the Hodges case. His state of mind is more likely to have been one of "unawareness" rather than "awareness" of the danger at the time of the crash. The punitive damages question may be a close one, but we agree that the court below was correct in concluding that this case should not go to the jury on punitive damages. We need not decide whether the doctrine of respondeat superior applies to punitive damages in other situations. Here there is no one still alive who, for reasons of moral dereliction, deserves punishment under Tennessee's theory of punitive damages.
 
 
 46
 III. The Comments of the District Judge on the Credibility
 
 
 47
 of Plaintiff's Expert Witness on Liability
 
 
 48
 Plaintiffs' counsel argues strongly that the district judge's comments on the credibility of plaintiffs' expert witness on liability was error that pervaded the entire trial and the jury's attitude toward the plaintiffs' case.
 
 
 49
 Early in the trial, a witness, Richard Childress, testified that Joe Duncan, the owner of defendant corporation, had previously made a damaging statement in anger. Duncan's statement was that he did not ordinarily furnish VFR charts to his pilots because his business was a "goddamned jet outfit; we don't carry VFR charts." Transcript of Trial, at 247. This precise statement was already before the jury when Richard Taylor, the plaintiff's main expert on liability, testified. The district judge told Taylor please not to repeat the word "goddamned" in quoting Duncan's previous statement. Taylor then used the word "GD" in place of the full curse word. This angered the trial judge who believed the witness had purposely disobeyed his instruction. The judge excused the jury and excoriated the witness. He then called the jury back and said to them:
 
 
 50
 This witness demonstrated to me his partisanship. It is up to you to believe whether or not you believe him or not. It demonstrated his partisanship and lack of objectivity. I think he did that on purpose.
 
 
 51
 It is up to you to decide whether or not you believe that or not.
 
 
 52
 Transcript of Trial, at 1035.
 
 
 53
 We do not know what effect this instruction had on the jury's view of the plaintiff's case, but our careful reading of the record indicates that the witness misunderstood the judge's instruction and did not intend to disobey. The district judge in this case is one of our most able and experienced federal trial judges, and we are reluctant to reject his view on a question of credibility. But our reading of the testimony indicates that Taylor was an otherwise credible, fair-minded, extremely knowledgeable, straightforward witness on the complex rules that govern pilots and their relationship to FAA assistants. Taylor has a distinguished aviation record as a pilot over many years, as a professor of aviation science at a leading university and as an author well known in the aviation community for his many books and articles on flying.
 
 
 54
 In light of our previous disposition of the liability question, the comments of the district judge were harmless error, at least on the question of liability. Our holding that the defendant should have been held fully and solely liable for the injury to plaintiffs concludes the liability question in favor of the plaintiffs' theory of the case, as recounted in the testimony of Richard Taylor.
 
 IV.
 
 55
 We have carefully reviewed the two damages issues raised by plaintiffs that the district court erred (1) in instructing the jury in awarding damages to deduct from decedent's gross income the amounts that would have been paid by the decedent for personal living expenses and income taxes and (2) in refusing to award prejudgment interest. We believe that the district court correctly applied Tennessee law on these questions. Likewise, we regard as meritless plaintiff's argument that the case was improperly removed and should be remanded to the state court for trial. Similarly, the district court ruled correctly under Tennessee law that settlements made with the families of two other deceased passengers in the amount of $3 million and $2.2 million were inadmissible. Rule 408 of the Tennessee evidence rules clearly excludes such compromise and settlement evidence, and the Federal Rule of Evidence is similar. See, e.g., McInnis v. A.M.F., Inc., 765 F.2d 240 (1st Cir.1985); Quad/Graphics, Inc. v. Fass, 724 F.2d 1230, 1235 (7th Cir.1983).
 
 V.
 
 56
 This leaves as the last question a serious issue concerning the propriety of the jury's award of total damages of $732,829 prior to making its 55% deduction for comparative fault.
 
 
 57
 The parties concede that the jury accepted in its entirety the view of defendant's expert, John Sartain, that the economic value of the deceased band leader was $732,829. The jury accepted this testimony instead of the testimony of four other experts, including another for the defendant who testified that the decedent's income would have been substantially higher than Sartain assumed. In addition, the jury made obvious errors by refusing to include in the award the decedent's substantial funeral expenses and by refusing to bring forward to the date of trial the discounted economic value of the life in question.
 
 
 58
 The worst mistake made by Sartain, and hence by the jury, however, was in relying upon an assumption that the economic value of decedent's life should be based on an average income for the last five years before his death of $59,920. The unreasonableness of this assumption is demonstrated by the fact that decedent was only 28 years old when he died and had earned as a musician an average of $98,171 for the last two years. He earned over $100,000 in income during the last year before his death. Sartain could only reach his rock bottom figures by averaging the decedent's very low earnings for the preceding five years when he was in music school and then when he was just getting started in his profession. Those early low income years reduced by almost a half the income used in the calculation of a portion of the stream of income, the discounted present value of which represents the economic evaluation of the decedent's projected earnings. If Sartain had based his evaluation on the $98,171 figure the result would have exceeded $1.2 million. Sartain assumed that the decedent's income would have been much less for each of the next seven years than it had been for the last two years of his life. We believe that there is no justification for such an approach in the evaluation of this decedent's life. As pointed out in detail in plaintiff's briefs, Sartain's assumption is entirely inconsistent with his own chart based on empirical studies projecting the average lifetime earnings profile of college educated males.[18]
 
 
 59
 Unfortunately, the jury in this case went far astray on both liability and damages. Thus, in accordance with this opinion, the judgment of the court below must be vacated and the case remanded to the district court with instructions that (1) the liability of the defendant has been established, and (2) the damages issue must be retried.
 
 
 60
 Accordingly, it is so ordered.
 
 
 
 *
 The Honorable Charles R. Simpson, III, Chief United States District Judge for the Western District of Kentucky, sitting by designation
 
 
 [1]
 In the vernacular of pilots, the San Diego metropolitan area has a TCA or Terminal Control Area. For pilots, this acronym carries with it a whole panoply of rules and regulations governing flight. It means that a VFR pilot taking off or landing must stay clear of a large dome of air space over San Diego until an FAA controller has positively cleared the aircraft into the area by radio, has given the pilot a radar identification code to transmit (a "squawk") and has given the pilot an altitude and direction of flight. Until the pilot who is taking off is "cleared" into the TCA by FAA "departure control," the pilot must remain outside of the dome of airspace defined by the TCA. 14 C.F.R. §§ 91.131-135. These facts and the flight procedures to be employed in and around TCA's are a part of the elementary knowledge of all experienced instrument rated pilots such as the one flying the plane in this case
 
 
 [2]
 December 13, 1990 Airman's Information Manual Rule 152 ("Services Available to Pilots, Flight Service Stations") states that:
 FSSs are air traffic facilities which provide pilot briefings, en route communications and VFR search and rescue services, assist lost aircraft and aircraft in emergency situations, relay ATC clearances, originate Notices to Airmen, broadcast aviation weather and NAS information, receive and process IFR flight plans, and monitor NAVAIDS. In addition, at selected locations FSSs provide En Route Flight Advisory Service (Flight Watch), take weather observations, issue airport advisories, and advise Customs and Immigration of transborder flights.
 
 
 [3]
 The Federal Aviation Regulations published in Title 14 of the Code of Federal Regulations have the force and effect of law. First of America Bank--Central v. United States, 639 F.Supp. 446, 453 (W.D.Mich.1986) (citing Tilley v. United States, 375 F.2d 678, 680 (4th Cir.1967) and United States v. Schultetus, 277 F.2d 322, 327 (5th Cir.1960)). The Airmen's Information manual "constitutes evidence of the standard of care for all certified pilots in the aviation community." First of America Bank--Central v. United States, 639 F.Supp. 446, 453 (W.D.Mich.1986) (citing Associated Aviation Underwriters v. United States, 462 F.Supp. 674, 680 (N.D.Tex.1978))
 
 
 [4]
 Defendant's expert admitted that the pilot was not "under the control" of a radar facility at the time of the crash. Transcript of Trial, Vol. IV, at 911
 
 
 [5]
 The Court then concluded:
 Air traffic controllers cannot be presumed to have X-ray vision and extrasensory perception. They must follow the rules and regulations that have been established by experts for their use, and we see no sign on the record before us that [the controller] deviated from the regulations. Our nation's skies are crowded to an unprecedented extent, and air traffic controllers are extremely busy. Our complex air travel system will become unsafe unless pilots themselves carefully follow prescribed flight guidelines to achieve the maximum safety in their own operations. In this case, several deviations from accepted pilot practice apparently occurred. Certainly the controller must assist even careless pilots who, based on the facts known to the controller, have placed themselves in a dangerous position. The record before us does not, however, sufficiently establish that the controller could have known that this aircraft was subject to dangerous conditions.
 Id. at 663-64.
 
 
 [6]
 Because the pilot and the flight specialist were intimately familiar with flight terminology and procedure, their conversations were conducted in a shorthand which was easily comprehensible to them, yet is difficult for the average person to follow
 
 
 [7]
 Contrary to the testimony of defendant's expert, Joseph Beaudoin, Kessock did not tell the pilot that he must leave Brown Field under visual flight rules instead of filing for a published IFR departure route. During the course of the first conversation, Kessock commented to the pilot that "you can go out depart VFR" and "pick your clearance up in the air," but there is no instruction by Kessock to the pilot that he should leave VFR instead of IFR or that this was his only option. Beaudoin testified "Mr. Kessock told him [the pilot] to take off VFR." Transcript of Trial, Vol. IV, at 881. Beaudoin's repeated testimony to the court and jury that Kessock negligently told the pilot to leave VFR was false and misleading. This issue was a red herring, although the jury apparently accepted Beaudoin's testimony to this effect
 
 
 [8]
 A pilot may generally fly under VFR flight rules up to 18,000 but above this level must fly under IFR flights and remain under the positive control of a FAA controller. 14 C.F.R. § 91.159
 
 
 [9]
 Runways are designated by compass headings. Runway 8 means the pilot will take off from the end heading 80 degrees to the east and Runway 26 means a takeoff from the opposite end heading 260 degrees to the west. Flight plans do not normally specify the runway a pilot will use for take-off because this usually depends on the local wind conditions at the time of take-off. Planes ordinarily take off into the wind which provides additional lift for climbing out. If the tower is open, the ground controller will designate the take-off runway
 
 
 [10]
 It is difficult to understand how an experienced pilot with 15,000 hours and a good reputation could have made such a terrible mistake. The charts show that the mountain range he flew into was plainly marked and that there was even higher terrain immediately to the northeast. We can only speculate that the pilot somehow became disoriented at the time of takeoff due to fatigue or lack of sleep or for some unknown reason
 
 
 [11]
 Positive control depends on radar contact and radar surveillance of the airplane by the air controller. There is a highly elaborate and complex system of controllers, radar equipment and communications and navigational radios and signals spread out across the country. In the air, the pilot does not normally come under positive control until the controller gives him a squawk and tells him that radar contact is now established. The squawk transmission from the pilot's transponder creates an image on the controller's radar screen that allows the controller to identify the airplane and follow its progress through the controller's airspace. In order to "squawk," a pilot dials into his radio transponder a four digit code, like 0306, provided by a controller. Pilots may not normally fly through TCA's or on IFR flights without a transponder which is squawking an identifying code so that the controller can identify the airplane on the controller's radar screen. 14 C.F.R. § 91.133 ("Restricted and prohibited areas. (a) No person may operate an aircraft within a restricted area (designated in part 73) contrary to the restrictions imposed, or within a prohibited area, unless that person has the permission of the using or controlling agency, as appropriate.")
 
 
 [12]
 FAA Order 7220.2A § 30-78 describes the order in which an air traffic controller should proceed when processing airfiles (as the controller in this case was obliged to do when the pilot contacted him, 45 seconds before the crash):
 a. Ensure the aircraft is within your area of jurisdiction unless otherwise coordinated.
 b. Obtain necessary information needed to provide IFR service. Record the information on a flight progress strip, and enter the information in the flight plan data base. Record additional information provided by the pilot on the flight progress strip or voice recorded.
 c. Issue clearance to destination, short range clearance, or an instruction to the pilot to contact a Flight Service Station (FSS) if you cannot process the flight plan.
 (emphasis added). FAA Order 7110.65 § 5-50, provides that controllers should establish and maintain radar identification of the aircraft involved, before they provide radar service, except as provided in 5-70b(2) and 5-70b(3).
 
 
 [13]
 "To ensure that a flight plan remains active, pilots whose actual departure time will be delayed 1 hour or more beyond their filed departure time, are requested to notify ATC of their departure time." December 13, 1990, Airman's Information Manual Rule 302 ("Change in Proposed Departure Time")
 
 
 [14]
 As noted in footnote 12, when processing airfiles, Air Traffic controllers are instructed to enter the flight plan before issuing a clearance
 
 
 [15]
 There was no 3,000 TCA that should have been a problem for the pilot in taking off on runway 8 to the east. The pilot could have flown the plane straight up to 18,000 VFR without a clearance
 
 
 [16]
 Although FAA orders also instruct controllers to give first priority to safety issues, those instructions also indicate that a controller "shall exercise his best judgment based on the facts and circumstances known to him." FAA Order 7110.65F § 2.2 (emphasis added)
 
 
 [17]
 Plaintiffs have called this Court's attention to the Tennessee Supreme Court's recent decision in Owens v. Truckstops of America, 915 S.W.2d 420 (1996). They have argued that, under Owens, a defendant tortfeasor cannot raise the defense of comparative fault of other tortfeasors who were non-parties if the plaintiff's claims against those other tortfeasors are barred by the statute of limitations. Thus, they assert, the verdicts against Kessock and Hughes must be set aside. While the Plaintiff's interpretation of Owens, if true, might provide an alternate rationale for the result reached here, we need not reach the issue. In light of this court's decision in this case, the question raised by the Owens opinion need not be decided
 
 
 [18]
 Plaintiff's reply brief at page 24 accurately explains the situation:
 He [Sartain] introduced as Exhibit 101 a chart showing the average age earnings profile of male full-time workers with four years of college. The curve on this chart shows that the average worker had 40% higher earnings at age 28 than at 23 and that for every year after age 28, the income increases until age 54 and the income at age 36 is 30% higher than the income at 28. Although Sartain testified that he relied on that age earnings profile "to show how earnings change at different ages for men with college education, like with Cappello's," his conclusion that Kirk P. Cappello's 1991 income at age 28 would have been only $59,920, the average of his previous five years is in direct conflict with the earnings profile. (Ex. 101). If Sartain had relied on the earnings curve on the profile, he could not have concluded that Kirk P. Cappello's 1991 income would have reduced to his average income for the previous five years or that he would not again have equalled his 1990 income until he reached the age of 36. If he had relied on the profile, he would have concluded that Kirk P. Cappello's 1991 income would have been more than his 1990 income of $100,000 and would have increased every year until he reached 54. This would have resulted in a pecuniary value of far more than $732,829. Sartain's own testimony established that there was absolutely no justification for using $59,920 as the 1991 income of Kirk P. Cappello.