107 F.3d 871
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Geneva TATUM, by her next friend and father, Chester TATUM,
Plaintiff-Appellee,
v.
Harold W. LAND, North Arkansas Wholesale Co., Inc., and
Wal-Mart Stores, Inc., Defendants-Appellants.
 No. 95-6378.
 United States Court of Appeals, Sixth Circuit.
 Feb. 26, 1997.
 
 1
 Before: RYAN and BATCHELDER, Circuit Judges; and MILES, Senior District Judge.*
 
 
 2
 MILES, Senior District Judge.
 
 
 3
 This diversity wrongful death action arises out of a motor vehicle accident which caused the death of Ellen York, the mother of plaintiff Geneva Tatum, a minor. Defendants Harold Land, North Arkansas Wholesale, Co., Inc., and Wal-Mart Stores, Inc. appeal the district court's denial of their motion for judgment as a matter of law and motion for new trial or remittitur. For the reasons to follow, we AFFIRM.
 
 
 4
 * This wrongful death action arises out of an accident that occurred on May 21, 1993. On that day, Ellen York was driving her car westbound on a highway in Shelby County, Tennessee. Defendant Harold Land was driving a tractor-trailer rig for North Arkansas Wholesale Co., Inc., on business for Wal-Mart Stores, Inc. Land made a left turn onto the entrance ramp of Interstate 40, crossing the path of York's car. The vehicles collided, and York died later that day from injuries which she sustained in the collision. She is survived by her young daughter, plaintiff Geneva Tatum.[1]
 
 
 5
 Plaintiff originally filed this action in a Tennessee state court. The defendants filed a Notice of Removal.[2] At the conclusion of a four-day trial, the jury reached a verdict favorable to the plaintiff, apportioning fault to both York and the defendants, 25 percent and 75 percent respectively. The jury also awarded damages of $1,000,000, resulting in a net award to the plaintiff of $750,000 after the 25 percent reduction for York's percentage of fault. The district court therefore entered judgment in favor of the plaintiff in the amount of $750,000.
 
 
 6
 The defendants filed a motion for judgment as a matter of law and, alternatively, for new trial or remittitur. After the district court denied their motion, the defendants filed this timely appeal.
 
 II
 
 7
 At trial the plaintiff introduced certain medical devices used by medical personnel in attempting to save Ellen York's life. These included a Sorenson inducer,[3] an endotracheal tube, a trocar,[4] and a bag of fluid. The defendants attack, on multiple grounds, the district court's decision allowing the use of these devices as demonstrative exhibits at trial. Specifically, the defendants argue that (1) the items were not listed as exhibits in the pretrial order; (2) they were not relevant because the plaintiff did not show that York was conscious at the time of their use; and (3) their probative value was outweighed by the danger of unfair prejudice.
 
 
 8
 District courts have broad discretion to modify or enforce pretrial orders, and we review such rulings for an abuse of discretion. Jackson v. Seaboard Coast Line R.R. Co., 678 F.2d 992, 1019 (11th Cir.1982). Here, the defendants appear to argue that they were the victims of surprise or "ambush" because, had they known about the exhibits, they would have called witnesses to testify about what would have been done to prepare York for the procedures. However, the record reflects that the defendants conceded below that they could not claim surprise because the devices had been used during depositions.[5] In addition, the defendants concede that testimony was elicited at trial from one of York's physicians, Dr. Fromke, who indicated that a local anesthetic is usually administered before insertion of the trocar. Given the absence of any true surprise and the apparent lack of prejudice caused by the failure to list the exhibits, we conclude that the district court did not abuse its discretion in allowing the plaintiff to use the devices.
 
 
 9
 The defendants also argue that the devices were not relevant because the plaintiff failed to show that York was conscious at the time of the abdominal lavage and intubation, the procedures for which the devices were used.[6] The defendants further argue that even if the devices were relevant, their probative value was outweighed by the danger of unfair prejudice. We will not disturb a district court's evidentiary rulings absent a clear showing of abuse of discretion. United States v. Williams, 952 F.2d 1504, 1518 (6th Cir.1991).
 
 
 10
 In this instance, we have little trouble concluding that the district court did not abuse its discretion in allowing the use of the devices. The defendants' argument that the plaintiff failed to show their relevance is meritless. The devices were clearly relevant to show the pain and suffering endured by York before her death. Moreover, the plaintiff did present evidence suggesting that York was conscious and able to feel pain at the time the devices were used. We find no merit in the defendants' argument that these devices merely frightened or inflamed the jury. Their presentation had a legitimate purpose: to show pain inflicted upon York as a result of the accident. Any prejudice to the defendants was not of the unfair type.[7] The district court therefore properly allowed the use of these items as exhibits at trial.
 
 III
 
 11
 The defendants argue that the district court erred in denying their motion for judgment as a matter of law on the issue of liability. Specifically, they contend that the evidence showed that York was 50 percent or more negligent, and therefore she should not have recovered any damages. See McIntyre v. Balentine, 833 S.W.2d 52, 57 (Tenn.1992) (under Tennessee's modified comparative fault standard, plaintiff may recover damages only if plaintiff's negligence remains less than defendant's).
 
 
 12
 We have recently held that a federal court sitting in diversity reviews de novo legal determinations raised by a motion under Fed.R.Civ.P. 50, and must apply the forum state's standard of review "only when a Rule 50 challenge is mounted to the sufficiency of the evidence supporting a jury's findings. No deference is appropriate in diversity cases to a trial court's resolution of legal questions." K & T Enterprises, Inc. v. Zurich Ins. Co., 97 F.3d 171, 176 (6th Cir.1996). Importantly, "it is clear that we need show no deference to the trial court's assessment of the sufficiency of the evidence before a jury, even if state law so requires." Id. Therefore, because the defendants' Rule 50 motion on the issue of liability is clearly based on a challenge to the sufficiency of the evidence supporting the jury's verdict, we must look to the law of Tennessee to determine the standard under which we review the motion. Tennessee law requires that a motion for judgment as a matter of law may be granted only if the court, after construing the evidence most strongly in favor of the non-movant and discarding all countervailing evidence, determines that reasonable minds could not differ as to the conclusions to be drawn from the evidence. Eaton v. McLain, 891 S.W.2d 587, 590 (Tenn.1994). "If there is any doubt as to the proper conclusion to be drawn from the evidence, the motion must be denied." Id.
 
 
 13
 We conclude that the district court did not err in refusing to grant the defendants judgment as a matter of law, nor did it err in refusing to grant a new trial on the issue of liability. The defendants' argument appears to be that even though Land clearly turned in front of York, she should have avoided the collision because the truck was large, easily visible, and slow-moving. The evidence at trial, however, showed that Land was responsible for creating the potential for the impact in the first place. The evidence also showed that Land did nothing to avoid the collision; he in fact claimed not to have seen York's car approaching. Finally, the evidence indicated that York might have attempted to veer to avoid the collision. Under the circumstances, the defendants were undoubtedly fortunate that the jury did not assign a higher percentage of fault to them. We will not venture to second-guess the verdict.
 
 IV
 
 14
 The defendants argue that the damages were excessive and that the district court erred in failing to order a remittitur or, alternatively, to grant a new trial. We review the district court's decision denying a motion for new trial or a remittitur for an abuse of discretion. Agristor Leasing v. A.O. Smith Harvestore Products, Inc., 869 F.2d 264, 268 (6th Cir.1989). An abuse of discretion exists where we are firmly convinced that a mistake has been made. Wayne, 36 F.3d at 525.
 
 
 15
 A motion for new trial seeking a remittitur of a jury's verdict should be granted only if the award clearly exceeds the maximum amount which a jury could reasonably find to be compensatory for the plaintiff's loss. Roush v. KFC Nat'l Management Co., 10 F.3d 392, 397 (6th Cir.1993) (citations omitted), cert. denied, 115 S.Ct. 56 (1994). "Unless the award is (1) beyond the range supportable by proof or (2) so excessive as to shock the conscience, ... or (3) the result of a mistake, we must let the award stand." Leila Hosp. and Health Ctr. v. Xonics Medical Sys., Inc., 948 F.2d 271, 278 (6th Cir.1991) (citations omitted).[8]
 
 
 16
 Recovery for wrongful death in Tennessee consists of two classes of damages: (1) damages purely for injury to the deceased, which embraces damages for mental and physical suffering, loss of time and necessary expenses resulting to the deceased from personal injury, and (2) incidental damages suffered by the next of kin from the death, including the pecuniary value of the life of the deceased. Wilkerson v. Altizer, 845 S.W.2d 744, 749 (Tenn.Ct.App.1992); Tenn.Code Ann. § 20-5-113. The defendants attack the million-dollar verdict on both fronts, arguing that the award for York's pain and suffering must have been excessive, and also that the award for the pecuniary value of York's life must have been excessive. The defendants seek a remittitur in the amount of $400,000, which after subtraction for York's percentage of fault ($600,000 minus 25%) would result in a judgment for plaintiff in the amount of $450,000.
 
 
 17
 Our use of the phrase "must have been excessive" in referring to the damage award components reflects a fundamental difficulty presented by this case. Unfortunately, we do not know the amount the jury awarded for each element of the damages; instead of a special verdict form which distinguished the elements of its damage award, the jury was provided with only a general verdict form for reporting its findings. Although a special verdict would have facilitated our review, we nonetheless undertake an analysis of the defendants' arguments regarding the elements of the damage award.
 
 
 18
 The plaintiff presented evidence, through an economist, of lost lifetime earning capacity of $381,471. Plaintiff's expert based his calculations on average figures for a black female of York's age at death (23). The defendants argue that this reliance on average figures resulted in an excessive award, because the evidence showed that York's actual earnings before her death were below average.[9] In support of their argument, the defendants rely principally on the recent case of Cappello v. Duncan Aircraft Sales of Florida, Inc., 79 F.3d 1465 (6th Cir.), cert. denied, 117 S.Ct. 432 (1996). In that case, the panel condemned the use of average income figures for determining the economic value of the decedent's life, because actual income figures for the two years preceding his death showed a dramatic rise in the decedent's income. However, that case is distinguishable, and, moreover, it does not constitute an overall condemnation of the use of average figures. The decedent in Cappello was a musician who had apparently experienced lower earnings and then earned approximately $100,000 in the last two years before his death, working for country singer Reba McIntire. Despite this $100,000 figure, the defendant's expert had used an average figure of approximately $60,000 in his calculations. In addition, however, the expert's assumptions were not even consistent with his own studies projecting average lifetime earnings for college-educated males.
 
 
 19
 In this case as in other similar cases, we cannot really know what the decedent would have earned in the future, and earnings projections are essential. The defendants unreasonably argue that the only proper award must be based on York's earnings immediately before her death; according to the defendants, York would have earned $6,443 in 1993, not the average figure of $16,193 for earning capacity relied upon by plaintiff's expert. However, the evidence showed that York had earned more in the two previous years than in 1993 ($8,110 in 1991 and $8,673 in 1992), and that she had only worked for the Wilson Inn for three or four months before her death; she had apparently been unemployed for a period during 1993. Moreover, she had a G.E.D. and some secretarial and computer training. Under the circumstances, we cannot conclude that it was unreasonable to base earnings capacity on average figures because the evidence suggested that plaintiff's earnings could likely have risen in the future.
 
 
 20
 We must also bear in mind that even if the plaintiff's economic figures were mistaken or excessive, we cannot assume that the jury's verdict represented its acceptance of those figures. In other words, because the jury returned a general verdict, we cannot truly know what the jury found the various components of the damage award to be. However, whether or not the jury found credible the plaintiff's evidence on pecuniary damages, we find it safe to say that the jury must have awarded a significant sum for York's pain and suffering. The defendants argue that this element of the jury's award must have amounted to a minimum of $594,217.75, for if the jury believed the plaintiff's economist's testimony, this is what remains of the total awarded, minus stipulated medical expenses of $21,687.25 and funeral expenses of $2,355. The defendants argue that this figure is excessive because it represents an award of approximately $118,843 per hour for the approximately five hours which York survived after the accident. The defendants further argue that because Tennessee law requires pain and suffering awards to be based on conscious pain and suffering, Memphis St. Ry. v. Berry, 118 Tenn. 581, 102 S.W. 85, 90 (1907), and because the plaintiff failed to show that York was conscious until her death, the award must certainly have been beyond the range of reasonableness.
 
 
 21
 Assuming for the sake of analysis that the jury's award for pain and suffering was in the $600,000 range as argued by the defendants, we find no basis to reverse the district court's decision or remit the award. Although the amount is indeed generous, it neither shocks our consciences nor goes beyond the range supportable by the proofs. York suffered very serious injuries in the accident, and trial testimony supported a finding that they were indeed painful injuries.[10] At some point before her death, she became comatose; however, the evidence showed that York was pharmacologically paralyzed shortly after her arrival at the hospital and it could not thereafter be determined whether she was conscious because she was unable to open her eyes. This uncertainty should be resolved against the defendant tortfeasors, and we must assume that the jury found that York was experiencing conscious pain after she was medicated, and that she was conscious of the unpleasant procedures which medical personnel performed in an attempt to save her life. Under the circumstances, the jury could well have found that York endured a substantial amount of pain and suffering before losing consciousness.
 
 
 22
 The defendants, however, argue that due to an error in its arithmetic, the district court was of the erroneous belief that the jury awarded $344,217.75 for York's conscious pain and suffering. The defendants are correct; the district court made a computational error in its analysis.[11] Although we would prefer to review an error-free analysis, the district court's error does not, in our view, warrant a reversal. Due to the use of a general verdict form, any analysis of the amount of pain and suffering the jury awarded is inherently somewhat speculative. Moreover, the district court was clearly aware of the amount of the remittitur sought by the defendants. See Order Denying Defendants' Renewal Motion for New Trial or Remittitur, at 7, n. 3 (noting that the defendants "seek a remittitur of $400,000.00 from the total verdict of $1,000,000.00, which, when reduced by decedent's percentage of fault (25%), results in a total award to decedent of $450,000"). The court also reviewed the evidence in detail in denying the defendants' motion. Our task here is not to determine simply whether the verdict was a bit high, but instead to determine whether the district court abused its discretion in allowing the verdict to stand. As we have already stated, we are not shocked by the jury's verdict. Any error made below cannot be attributed to the jury, whose award was within the range supportable by the proof. We conclude that the district court did not abuse its discretion in declining to disturb the award.
 
 V
 
 23
 For the foregoing reasons, we AFFIRM.
 
 
 
 *
 Honorable Wendell A. Miles, Senior United States District Judge for the Western District of Michigan, sitting by designation
 
 
 [1]
 Chester Tatum, the father of Geneva Tatum, filed this action in her behalf
 
 
 [2]
 Chester Tatum named Land and North Arkansas Wholesale Co. as defendants in the action which he filed on behalf of his daughter. Days after Tatum filed this action, another relative of Ellen York filed a competing action naming Wal-Mart as a defendant. This second action was consolidated with the action filed by Tatum, and the district court later ruled that he was the proper party to pursue the lawsuit
 
 
 [3]
 A Sorenson inducer is a catheter placed in the femoral artery (the groin area) to give intravenous fluids
 
 
 [4]
 A trocar is a sharp instrument used to puncture the abdomen before performing an abdominal lavage. The abdominal lavage was performed on York to determine if she suffered abdominal injury. The procedure involves the infusion of saline into the abdomen, and subsequent drainage
 
 
 [5]
 At trial, defendants' counsel stated that "I've seen these things before, and the fact they're not listed is not the strongest of my arguments."
 
 
 [6]
 Tennessee law requires awards for pain and suffering to be based on conscious pain and suffering. Memphis St. Ry. v. Berry, 118 Tenn. 581, 102 S.W. 85, 90 (1907)
 
 
 [7]
 The defendants suggest that the devices were more frightening to the jury because they were offered "in the cold light of the courtroom." Appellant's Brief at 33. To the contrary, in our view, the exhibition of these devices in this setting dulled rather than heightened their impact
 
 
 [8]
 In diversity cases, district courts must apply the "damage-control standard state law supplies," subject to federal appellate review for abuse of discretion. Gasperini v. Center for Humanities, Inc., 116 S.Ct. 2211, 2225 (1996). In Gasperini, New York statutory law required a determination that an award was excessive if it "deviates materially from what would be reasonable compensation." Concluding that this standard required closer court review than the traditional "shock the conscience" test, id. at 2220, the Court held that Erie principles required application of the New York standard, which was arguably part of a procedural statute, because to hold otherwise could result in larger recoveries in federal court than those which a state court could entertain. Id. at 2221. In this case, however, neither party has suggested that Tennessee law imposes a standard for review of awards which differs from that which we traditionally apply. See Tenn.Code Ann. § 20-10-102(a) (trial judge may suggest remittitur where he is "of the opinion that the verdict in favor of a party should be reduced"); see also Thrailkill v. Patterson, 879 S.W.2d 836, 840 (Tenn.1994) (appellate court will not disturb verdict approved by trial judge " 'unless it is evident that he failed to keep the jury within reasonable bounds' ") (citation omitted)
 
 
 [9]
 The defendants also argue that the expert's consumption figures were incorrect, because the evidence showed that York received public assistance and was therefore consuming all of her income. However, because we believe that this argument relies on the success of their argument regarding the use of average figures, we will not address it separately
 
 
 [10]
 The evidence showed that York was conscious while being extracted from her car and that she screamed afterward. She remained conscious while being transported to the hospital via helicopter, and asked for help. Upon arrival at the hospital, York was heard to scream "Oh my God," and she was responsive to pain. She suffered injuries to her shoulder, humerus, pelvis, femur, and face. She also suffered a closed head injury. Because she had a head injury, she did not receive narcotic pain relievers; these would have made it difficult to perform an accurate neurological evaluation
 
 
 [11]
 Specifically, the district court added medical and funeral expenses ($21,687.25 and $2,355.00 respectively) to lost earning capacity of $381,740.00. The court then subtracted this sum ($405,782.25) from the "total verdict" of $750,000, to arrive at the figure of $344,217.75 for pain and suffering. See Order Denying Defendants' Renewal Motion for Judgment as a Matter of Law and Defendants' Motion for New Trial or Remittitur, at 7, n. 3. However, the court's use of $750,000 as the total verdict amount was wrong; the court erroneously reduced the actual total verdict of $1,000,000 by York's percentage of fault (25%) before subtracting the sums representing the other elements of the damage award. As noted previously, the proper analysis would have resulted in a figure of $594,217.75 for pain and suffering